CRUSHED STONE CO., Inc., a Corporation, and Harry T. Pratt, Plaintiffs in Error,

v.

Vernon MOORE, Lucille Ruddle, Carl Smeltzer, H. D. Mabry, Lewis Kinney, Alvin L. Sullivan, C. H. Hardcastle, Ted S. Smith, and Lawrence R. Eubanks, Defendants in Error.

No. 39417.

Supreme Court of Oklahoma.

March 18, 1962.

Hudson, Hudson, Wheaton & Kyle, William F. Kyle, Tulsa, for Crushed Stone Co., Inc., plaintiff in error.

Doerner, Stuart, Moreland, Campbell & Saunders, Harry D. Moreland, Tulsa, for Harry T. Pratt, plaintiff in error.

Holly L. Anderson, Tulsa, for defendants in error.

BLACKBIRD, Vice Chief Justice.

This appeal involves an action to enjoin the operation of a limestone rock quarry, located on land belonging to Harry T. Pratt, about one and a half or two miles from where a section line road, known as "Coyote Trail" intersects with the Sapulpa-Sand Springs road.

In 1950, when the Turner Turnpike was being linked with the Will Rogers Turnpike, a road construction business known as "Layman & Sons" operated this quarry to furnish materials for that road.

After an interval, during which there were no operations at the quarry, Crushed Stone Co., Inc., leased the land from Pratt, and commenced operating the quarry with its own equipment, in June, 1957. In December of the same year, said Company, hereinafter referred to by the letters "C. S. C.", suspended its operations at the quarry, but resumed them in June, 1958.

Defendants in error, hereinafter referred to as plaintiffs, are the owners and inhabitants of premises near the quarry, covering rural acreages of from 5 to 40 acres. They instituted this action to enjoin operations at the quarry in October, 1958. The gist of their alleged cause of action against Pratt and C. S. C., was that the operation of the quarry, not only damaged their property, but that it interfered with their rights to the quiet and peaceful occupation, and enjoyment, of them.

The complaints against C. S. C.'s operation, testified to at the trial before the court by four men, who were plaintiffs in the action, together with their wives, and a widow, Lucille Ruddle, were directed against the dust, which filled the air and settled on nearby property; to the noise, concussion, vibration and rock propulsion caused by C. S. C.'s setting off explosives to blast the rock out of the ground; and to the noise and dust caused by the subsequent crushing of the rock into "agricultural limestone" and its loading into dump trucks to be hauled away. Some of said witnesses testified that the air around their homes was so full of dust, after such blasting, that it was hard to breathe; some testified that the dust not only covered the vegetation on their properties, making it look white, but came into their houses— even with the doors and windows closed— coating the furniture and floors and soiling draperies and damaging painted surfaces. Some also testified that the explosions shook the earth as well as their houses, cracking and dislodging the masonry and sheetrock therein and frightening and/or disturbing the occupants. Some also testified that the explosions propelled flying rocks onto the premises, breaking limbs from trees and creating a condition hazardous to both animal and human life. Some of the witnesses also testified that, because of the dust, they could not have the windows and doors of their homes open, and could not hang clothes out in their yards to dry. One witness testified that the dust aggravated his allergies, and worsened his wife's nervous condition. More than one witness testified that the noise from the work at the quarry disturbed, or interrupted, their sleep.

Defendants attempted to show, by the testimony of some of their witnesses, that some of the claims made by certain of the plaintiffs' witnesses about the effects of the quarry operations were exaggerated. Part of this testimony was elicited from the so-called "expert" witnesses, Ben Poisner and Harold H. White. Poisner attempted to show, by analyses of dust samples he had

made, that most of the dust, of which plaintiffs complained, had too great a silica content to be limestone dust from the quarry operations. White, a consulting engineer specializing on explosive effects, testified in substance, that, at C. S. C.'s request, he conducted two tests with certain seismographic instruments and equipment, scientifically designed to measure impacts from the blasting. According to these tests—one conducted at the well house on Mrs. Ruddle's property, July 3, 1957, and another at the Eubanks home, January 14, 1959—6800 pounds of explosive, loaded into 50 holes, 31 feet deep, on the face of the quarry, created fewer decibels of noise than one clap of thunder, or New York City street traffic, and insufficient vibration to cause any structural injury on plaintiffs' premises.

After the trial had been continued from the first week in August, 1959; and, at a further hearing on September 21, 1959, defendants had introduced testimony that they had inaugurated certain corrective measures in their operations which reduced the original ill effects therefrom, and arrangements had been made for the trial judge to go to the quarry a week later, and there watch a test shot being exploded and personally view the situation, the court took the case under advisement and allowed submission of briefs.

Thereafter, in May, 1960, the court adjudged that the manner in which the quarry was being operated constituted a public and private nuisance. He expressed the further opinion, however, that defendants should have an opportunity to "correct" the situation, and gave them until July 17, 1960, for that purpose. After the case was taken under further advisement, until August 8, 1960, and recessed until the next day, both sides were allowed to introduce testimony pertaining to the results of C. S. C.'s attempts to reduce, or prevent, the harmful effects from its operations. After evidence had been introduced, on behalf of defendants, showing that C. S. C., had expended $13,000, or more, making certain improvements in the plant, and had made

certain changes in their operations designed to reduce the dust, noise, and vibration from the quarry's operation, and plaintiffs had countered with evidence contemplated to show that operation of the quarry still constituted a nuisance, the court revisited the area and viewed the situation. When the case came on for judgment August 16, 1960, the court announced that evidence introduced since the preceding May 18, was insufficient to show an abatement of the nuisance. In his judgment, the court affirmatively found, and adjudged, that the operation of the quarry continued to constitute both a public and private nuisance, and ordered it abated by cessation of its operation, within 15 days, and removal of the accumulated stock piles (of agricultural limestone) within 30 days. After the overruling of their separate motions for a new trial, defendants perfected the present appeal.

As their first proposition for reversal, defendants have formulated the following:

"It is the duty of the court in considering an application of equitable power by injunction to take into account the question of comparative injury."

Having called our attention to evidence showing previous disposition, by trial or settlement, of two actions for damages to two of the same home properties, around which plaintiffs built their case for an injunction here, and to the conflict between plaintiffs' and defendants' evidence as to the volume of noise, and intensity of vibrations, from blasting at the quarry, defendants set forth in their brief a quotation from McCarthy v. Bunker Hill & Sullivan Mining & C. Co., (U.S.C.A. 9th Cir.) 164 F. 927, which case was cited in our opinion in Tulsa Creamery Co. v. Tulsa Milk Products Coop. Ass'n, 175 Okl. 51, 51 P.2d 950, 952, for a statement from which defendants' above-quoted proposition is apparently derived. Defendants also cite the following quotation from City of Harrisonville v. W. S. Dickey Clay Mfg. Co., 289 U.S. 334, 53 S.Ct. 602, 77 L.Ed. 1208, 1211:

" * * * Where substantial redress can be afforded by the payment of money and issuance of an injunction would subject the defendant to grossly disproportionate hardship, equitable relief may be denied although the nuisance is indisputable. This is true even if the conflict is between interests which are primarily private. * * *."

Apparently, in support of the argument that the losses to be suffered by defendants by cessation of the quarry's operations will be so great in comparison with the (presumably) lesser injuries plaintiffs will suffer from a continuation of same, that the trial court should not have ordered cessation, defendants refer to the testimony of C. S. C.'s President, and principal stockholder, Harold D. Youngman, that the value of the quarry, and his company's rock crusher, is "well over $300,000.00", and that the plant has employed 23 or 24 persons, with a total annual payroll of $140,000.00. They also cite testimony to the effect that, when, after the first hearing, the court (as hereinbefore indicated) continued the trial to enable C. S. C. to attempt to reduce the blowing of dust from its operations, said company "greatly reduced * * * the dust and noise problem" by installing "washers", and by watering the road leading in and out of the plant.

Examination of the record reveals some conflict in the testimony as to just how much the above referred to innovations reduced the objectionable features of the quarry operations. One witness's testimony was to the effect that these, and changes made in the character and quantity of the explosives used in the blasting, did not perceptibly reduce the evils from which plaintiffs were suffering at the beginning of the trial. While at least one witness testified that dust from the quarry operations blew north to her premises only when the wind was from the south, there is other testimony to the effect that so much dust has settled on tree leaves, other vegetation, and objects generally, that wind blowing from any direction sets it adrift in the air, except, perhaps, right after a rain. Such conflicts

in the evidence are of a character that must necessarily be resolved by the trial court's judgment. As said in the McCarthy case, supra, " * * * an appellate court will not ordinarily interfere with the action of the trial court in either granting or withholding an injunction in cases in which the evidence is substantially conflicting, and especially where the trial judge, at the request of the respective parties, has had the benefit of a personal inspection of the premises." Nor does the fact that some of the plaintiffs have obtained damages in actions of legal cognizance preclude them from obtaining injunctive relief, also. See cases cited in the Annotation at 47 A.L.R.2d 490, 502ff.

In the present case, as hereinbefore noted, the trial judge viewed the situation at, and surrounding the quarry, not just once, but twice. This fact comprises a substantial answer to defense counsel's charge that some of plaintiffs' testimony was exaggerated, and in conflict with actual, and/or physical, facts—which conflict, defendants attempted to establish by the testimony of their two expert witnesses. Because of the trial judge's personal observation, he was in a much better position than are we, to determine the extent, if any, to which such testimony was exaggerated, or contrary to the facts. The short answer to defense counsel's statements inferentially attributing implausibility to Lewis Kinney's testimony that rock was broken on the south side of his house, while none was broken on its other sides, is that the south side, which faced the quarry operations, was the only side of the house that had such masonry on it.

While we recognize that in proper cases, especially those involving businesses upon which the public's interest, or necessity, depends, the matter of "comparative injury" should be given prominent consideration, this court is among those holding that where damages in an action at law will not give plaintiffs an adequate remedy against a business operated in such a way that it has become a nuisance, and such operation causes plaintiffs substantially and irremediable injury, they are entitled, as a matter of

right, to have same abated, by injunction "* * * notwithstanding the comparative benefits conferred thereby or the comparative injury resulting therefrom." See Kenyon v. Edmundson, 80 Okl. 3, 193 P. 739, and other cases cited in the Annotations at 61 A.L.R. 924, 927ff. In the present case, through the trial judge's patience, thoroughness, and evident desire to be fair, and avoid unnecessary hardship to defendants, he afforded ample opportunity for a determination of whether C. S. C.'s quarry operations could be continued in such a way that they might be reasonably tolerated. His subsequent judgment determining, in effect, that they could not, cannot be said to be clearly against the weight of the evidence, nor contrary to law.

■ As its second, and last proposition, defendants assert:

"Persons who live near a lawful business operation, or who moved into such a neighborhood, must necessarily submit to the noise, annoyances and discomforts incident to a proper and ordinary conduct of such business."

From the decisions defendants cite under the above quoted proposition, they seek application to this case of some one, or more, of the principles that have been applied by some courts to cases where plaintiffs had previously bought, or moved into, a residence near the business, whose operation they sought to enjoin. One of the cases refers to the basis of refusing such party's injunctive relief, as "the doctrine of coming to a nuisance." Inherent in such doctrine—and one of its necessary elements—is the plaintiff's knowledge, or notice, that the objectionable business operation was there, when he moved near it, and thus potentially, at least, subjected himself to the condition, or conditions, complained of. The proof establishes without contradiction that all of the plaintiffs, about which there is any evidence on that subject, acquired their homes either before (as far as the record shows) there was any identified operation of the quarry, or during a period in which it was lying dormant, or apparently abandoned,

except Carl and Mrs. (Mildred) Smeltzer. Mr. Smeltzer testified that he knew the location of the C. S. C.'s rock crusher before he and his wife purchased their 5-acre tract, about September, 1958. Mrs. Smeltzer testified that, at that time, she didn't know of the crusher and that, because of the wooded area between the two, it could not be seen from their house. She testified that when she and her husband looked at the property, before purchasing same, it was raining, or had been raining, or had been raining so recently that the dust had washed off of the foliage and things.

We do not think the latter evidence is sufficient to render the trial court's judgment erroneous. To hold otherwise would be tantamount to holding that, because of the operation of the quarry before, and at the time, the Smelzers acquired their property, defendants could restrict its future uses. In this connection, see Sooy v. Giacomucci (Pa.) 31 Del.Co.R. 345, discussed in the Annotations in 47 A.L.R.2d, supra, at p. 510. Notice also Brede v. Minnesota Crushed Stone Co., 143 Minn. 374, 173 N.W. 805, 6 A.L.R. 1092, 1098.

■■ Defendants also say that the trial court's judgment goes beyond the issue to be determined, and that it grants relief plaintiffs did not seek. This apparently has reference to the fact that the judgment required removal of the stockpiles, as well as cessation of the quarry's operation. While, as defendants point out, plaintiffs' petition did not pray specifically for removal of the stockpiles, it did pray "for such * * relief as in equity plaintiffs may be entitled." The evidence tended to show that fine "agricultural limestone" dust blows off of these stockpiles toward plaintiffs' premises and, at least partially, accounts for one of the evils of C. S. C.'s operations, as far as concerned plaintiffs. We think that, in view of the court's broad equitable powers, it was not error for it to order removal of these stockpiles. In this connection, see the discussion in Moral Ins. Co. v. Steves, 208 Okl. 529, 257 P.2d 836, 840, and Woodrow v. Ewing, Okl., 263 P.2d 167, 172.

After having carefully examined the record, and applied to the evidence therein, the principles approvingly referred to above, we are not convinced that any of defendants' arguments demonstrate substantial ground for reversing the judgment appealed from herein. Said judgment is therefore affirmed.

WILLIAMS, C. J., and HALLEY, JOHNSON, JACKSON, IRWIN and BERRY, JJ., concur.