STATE ex rel. ATTORNEY GENERAL OF OKLAHOMA v. JOHNSON & JOHNSON



 

 
 
 
 
 
 Skip to Main Content
 Accessibility Statement
 
 
 
 
 
 Help
 Contact Us
 
 
 
 
 e-payments
 Careers
 
 
 
 
 
 
 
 
 
 
 
 Home
 Courts
 Decisions
 Programs
 News
 Legal Research
 Court Records
 Quick Links
 
 
 
 
 
 OSCN Found Document:STATE ex rel. ATTORNEY GENERAL OF OKLAHOMA v. JOHNSON & JOHNSON

 

 
 



 
 
 
 
 Previous Case

 
 Top Of Index

 
 This Point in Index

 
 Citationize

 
 Next Case

 
 Print Only
 
 
 

 
 STATE ex rel. ATTORNEY GENERAL OF OKLAHOMA v. JOHNSON & JOHNSON
2021 OK 54
Case Number: 118474
Decided: 11/09/2021
THE SUPREME COURT OF THE STATE OF OKLAHOMA
Cite as: 2021 OK 54, __ P.3d __

 
NOTICE: THIS OPINION HAS NOT BEEN RELEASED FOR PUBLICATION. UNTIL RELEASED, IT IS SUBJECT TO REVISION OR WITHDRAWAL. 

 

 

STATE OF OKLAHOMA ex rel. MIKE HUNTER, Attorney General of Oklahoma, Plaintiff/Appellee/Counter-Appellant,
v.
JOHNSON & JOHNSON; JANSSEN PHARMACEUTICALS, INC.; ORTHO-McNEIL JANSSEN PHARMACEUTICALS, INC., n/k/a JANSSEN PHARMACEUTICALS, INC.; and JANSSEN PHARMACEUTICA, INC., n/k/a JANSSEN PHARMACEUTICALS, INC., Defendants/Appellants/Counter-Appellees,
and
PURDUE PHARMA L.P.; PURDUE PHARMA, INC.; THE PURDUE FREDERICK COMPANY; TEVA PHARMACEUTICALS USA, INC.; CEPHALON, INC.; ALLERGAN, PLC, f/k/a ACTAVIS, PLC, f/k/a ACTAVIS, INC., f/k/a WATSON PHARMACEUTICALS, INC.; WATSON LABORATORIES, INC.; ACTAVIS LLC; and ACTAVIS PHARMA, INC., f/k/a WATSON PHARMA, INC., Defendants.

ON APPEAL FROM THE DISTRICT COURT OF CLEVELAND COUNTY

The Honorable Thad Balkman, Trial Judge

¶0 An opioid manufacturer appealed a $465 million verdict following a bench trial in a public nuisance lawsuit. The district court held the opioid manufacturer liable under Oklahoma's public nuisance statute for its prescription opioid marketing campaign. The State of Oklahoma counter-appealed, and this Court retained the appeal. We hold the opioid manufacturer's actions did not create a public nuisance. The district court erred in extending the public nuisance statute to the manufacturing, marketing, and selling of prescription opioids.

DISTRICT COURT'S JUDGMENT REVERSED.

Mike Hunter, Attorney General for the State of Oklahoma, Abby Dillsaver, General Counsel to the Attorney General, and Ethan A. Shaner, Deputy General Counsel, Oklahoma Office of the Attorney General, Oklahoma City, Oklahoma, for Plaintiff/Appellee/Counter-Appellant.

Michael Burrage, Reggie Whitten, and Randa K. Reeves, Whitten Burrage, Oklahoma City, Oklahoma, for Plaintiff/Appellee/Counter-Appellant.

Bradley E. Beckworth, Lisa Baldwin, and Nathan B. Hall, Nix Patterson, LLP, Oklahoma City, Oklahoma, for Plaintiff/Appellee/Counter-Appellant.

John Thorne, Brendan J. Crimmins, and Ariela M. Migdal, Kellogg, Hansen, Todd, Figel & Frederick, P.L.L.C., Washington, D.C., for Plaintiff/Appellee/Counter-Appellant.

Larry D. Ottaway, Amy Sherry Fischer, and Andrew M. Bowman, Foliart, Huff, Ottaway & Bottom, Oklahoma City, Oklahoma, for Defendants/Appellants/Counter-Appellees.

Andrew W. Lester and A.J. Ferate, Spencer Fane LLP, Oklahoma City, Oklahoma, for Defendants/Appellants/Counter-Appellees.

Benjamin H. Odom, John H. Sparks, and Michael W. Ridgeway, Odom & Sparks, PLLC, Norman, Oklahoma, for Defendants/Appellants/Counter-Appellees.

Charles C. Lifland and Jonathan P. Schneller, O'Melveny & Myers, LLP, Los Angeles, California, for Defendants/Appellants/Counter-Appellees.

Stephen D. Brody, O'Melveny & Myers, LLP, Washington, D.C., for Defendants/Appellants/Counter-Appellees.

Jeffrey L. Fisher, O'Melveny & Myers, LLP, Menlo Park, California, for Defendants/ Appellants/Counter-Appellees.

Winchester, J.

¶1 An opioid drug epidemic exists in the United States. Oklahoma has experienced abuse and misuse of opioid medications, opioid use disorder, and thousands of opioid-related deaths in the past two decades. Specifically, opioid-related deaths increased during the early 2000s, plateaued around 2007, and then declined.[1] What we cannot ignore is that improper use of prescription opioids led to many of these deaths; few deaths occurred when individuals used pharmaceutical opioids as prescribed. We also cannot disregard that chronic pain affects millions of Americans. It is a persistent and costly health condition, and opioids are currently a vital treatment option for pain. The U.S. Food and Drug Administration ("FDA") has endorsed properly managed medical use of opioids (taken as prescribed) as safe, effective pain management, and rarely addictive.[2] Yet opioid abuse is still prevalent and has become a complex social problem.

¶2 To address this problem, the State of Oklahoma ex rel. Mike Hunter, Attorney General of Oklahoma ("State"), sued three prescription opioid manufacturers and requested that the district court hold opioid manufacturers liable for violating Oklahoma's public nuisance statute. The question before the Court is whether the conduct of an opioid manufacturer in marketing and selling its products constituted a public nuisance under 50 O.S.2011, §§ 1 & 2. We hold that the district court's expansion of public nuisance law went too far. Oklahoma public nuisance law does not extend to the manufacturing, marketing, and selling of prescription opioids.

FACTS AND PROCEDURE

¶3 Since the mid-1990s, Appellant Janssen Pharmaceuticals, Inc. (and its related entities), a wholly-owned subsidiary of Appellant Johnson & Johnson (collectively "J&J"), has manufactured, marketed, and sold prescription opioids in Oklahoma. J&J specifically manufactured two FDA-approved Schedule II[3] opioid medications: (1) Duragesic--a transdermal patch that provides a controlled dose of pharmaceutical fentanyl[4]; and (2) Nucynta and Nucynta ER--tablets with tapentadol.[5] J&J also manufactured a Schedule IV opioid medication: Ultram and Ultram Extended Release--tablets with tramadol.[6] J&J marketed several other medications containing tramadol.

¶4 The State presented evidence that J&J used branded and unbranded marketing, which actively promoted the concept that physicians were undertreating pain. Ultimately, the State argued J&J overstated the benefits of opioid use, downplayed the dangers, and failed to disclose the lack of evidence supporting long-term use in the interest of increasing J&J's profits.

¶5 J&J no longer promotes any prescription opioids and has not done so for several years. J&J ceased to actively promote its Schedule II branded products by 2015. Specifically, J&J ceased to actively promote Duragesic in 2007, and it divested its U.S. Nucynta product line in 2015. Even with J&J's marketing practices, these two Schedule II medications amounted to less than 1% of all Oklahoma opioid prescriptions. Overall, J&J sold only 3% of all prescription opioids statewide, leaving the other opioid manufacturers named in this suit responsible for selling 97% of all prescription opioids.[7]

¶6 On June 30, 2017, the State sued three opioid manufacturers--J&J (and its related entities[8]), Purdue Pharma L.P. (and its related entities[9]), and Teva Pharmaceuticals USA, Inc. (and its related entities[10]) alleging the companies deceptively marketed opioids in Oklahoma. The State settled with the other opioid manufacturers[11] and eventually dismissed all claims against J&J except public nuisance. The district court conducted a 33-day bench trial with the single issue being whether J&J was responsible for creating a public nuisance in the marketing and selling of its opioid products. The district court held J&J liable under Oklahoma's public nuisance statute for conducting "false, misleading, and dangerous marketing campaigns" about prescription opioids. The district court ordered that J&J pay $465 million to fund one year of the State's Abatement Plan, which consisted of the district court appropriating money to 21 government programs for services to combat opioid abuse.[12] The amount of the judgment against J&J was not based on J&J's percentage of prescription opioids sold. The district court also did not take into consideration or grant J&J a set-off for the settlements the State had entered into with the other opioid manufacturers. Instead, the district court held J&J responsible to abate alleged harms done by all opioids, not just opioids manufactured and sold by J&J.

¶7 J&J appealed. The State cross-appealed contending that J&J should be responsible to pay for 20 years of the State's Abatement Plan, or approximately $9.3 billion to fund government programs. This Court retained the appeal.

¶8 The issue before this Court is whether the district court correctly determined that J&J's actions in marketing and selling prescription opioids created a public nuisance. We hold it did not. The nature of the nuisance claim pled by the State is the marketing, selling, and overprescribing of opioids manufactured by J&J. This Court has not extended the public nuisance statute to the manufacturing, marketing, and selling of products, and we reject the State's invitation to expand Oklahoma's public nuisance law.

¶9 In reaching this decision, we do not minimize the severity of the harm that thousands of Oklahoma citizens have suffered because of opioids. However grave the problem of opioid addiction is in Oklahoma, public nuisance law does not provide a remedy for this harm.

STANDARD OF REVIEW

¶10 This public nuisance action comes to us as an appeal from a judgment rendered in a bench trial. The district court's judgment presented for review is a compilation of both findings of facts and conclusions of law. K & H Well Serv., Inc. v. Tcina, Inc., 2002 OK 62, ¶ 9, 51 P.3d 1219, 1223. "When, as here, the case is tried to the court, its determination of facts [is] accorded the same force as those made by a well-instructed jury." Id. Our case law instructs that where "any competent evidence supports the trial court's findings of fact, the same will be affirmed." Id.

¶11 An action for abatement of a nuisance is equitable in nature. See, e.g., Jackson v. Williams, 1985 OK 103, ¶ 9, 714 P.2d 1017, 1020. "In a case of equitable cognizance, a judgment will be sustained on appeal unless it is found to be against the clear weight of the evidence or is contrary to law or established principles of equity." McGinnity v. Kirk, 2015 OK 73, ¶ 8, 362 P.3d 186, 190. When reviewing a case at equity, this Court is not bound by the district court's findings and will consider the whole record and weigh the evidence. Harrell v. Samson Res. Co., 1998 OK 69, ¶ 31, 980 P.2d 99, 107.

¶12 Issues in this appeal concern the district court's legal interpretation of Oklahoma's nuisance statutes, specifically 51 O.S.2011, §§ 1 and 2. Statutory construction poses a question of law. State ex rel. Prot. Health Servs. State Dep't of Health v. Vaughn, 2009 OK 61, ¶ 9, 222 P.3d 1058, 1064. We review issues of law de novo, "since an appellate court has plenary, independent and non-deferential authority to reexamine a trial court's legal rulings." Id.

DISCUSSION 

I. ORIGINS AND HISTORY OF OKLAHOMA PUBLIC NUISANCE LAW

¶13 Public nuisance began as a criminal remedy primarily employed to protect and preserve the rights and property shared by the public. It originated from twelfth-century England where it was a criminal writ to remedy actions or conditions that infringed on royal property or blocked public roads or waterways. Michelle L. Richards, Pills, Public Nuisance, and Parens Patriae: Questioning the Propriety of the Posture of the Opioid Litigation, 54 U. Rich. L. Rev. 405, 418 (2020). The king had the authority to bring such claims, seeking only injunction or abatement as remedies. During the sixteenth century, other individuals began to bring private nuisance claims seeking only injunctive relief when they had a "special" injury. Id.

¶14 Public nuisance came to cover a large, miscellaneous and diversified group of minor criminal offenses. Restatement (Second) of Torts § 821B cmt. b (Am. Law Inst. 1979). The offenses involved an "interference with the interests of the community at large--interests that were recognized as rights of the general public entitled to protection." Id. The Restatement (Second) of Torts explained the interests as follows:

Interference with the public health, as in the case of keeping diseased animals or the maintenance of a pond breeding malarial mosquitoes; with the public safety, as in the case of the storage of explosives in the midst of a city or the shooting of fireworks in the public streets; with the public morals, as in the case of houses of prostitution or indecent exhibitions; with the public peace, as by loud and disturbing noises; with the public comfort, as in the case of widely disseminated bad odors, dust and smoke; with the public convenience, as by the obstruction of a public highway or a navigable stream; and with a wide variety of other miscellaneous public rights of a similar kind.

Id. 

¶15 Public nuisance evolved into a common law tort. It covered conduct, performed in a location within the actor's control, which harmed those common rights of the general public. Id. It has historically been linked to the use of land by the one creating the nuisance. Nichols v. Mid-Continent Pipe Line Co., 1996 OK 118, ¶ 8, 933 P.2d 272, 276. A public entity that proceeds against the one in control of the nuisance may only seek to abate, at the expense of the one in control of the nuisance. Courts have limited public nuisance claims to these traditional bounds. See, e.g., In re Lead Paint Litig., 924 A.2d 484, 499 (N.J. 2007). 

¶16 Oklahoma's nuisance statute codifies the common law. Nichols, 1996 OK 118, ¶ 8, 933 P.2d at 276. It states:

A nuisance consists in unlawfully doing an act, or omitting to perform a duty, which act or omission either:

First. Annoys, injures or endangers the comfort, repose, health, or safety of others; or
Second. Offends decency; or
Third. Unlawfully interferes with, obstructs or tends to obstruct, or renders dangerous for passage, any lake or navigable river, stream, canal or basin, or any public park, square, street or highway; or
Fourth. In any way renders other persons insecure in life, or in the use of property, provided, this section shall not apply to preexisting agricultural activities.

50 O.S.2011, § 1. The Oklahoma Legislature has long defined public nuisance as a nuisance that contemporaneously affects an entire community or large group of people, but need not damage or annoy equally to all. Id. § 2.

¶17 Oklahoma's nuisance and public nuisance statutes became law in 1910. Id. §§ 1, 2. The Legislature has amended the nuisance statute once, to exempt certain preexisting agricultural activities. See Act of May 12, 1980, Ch. 189, Sec. 1, 1980 Okla. Sess. Laws, 425, 425. The Legislature has never amended the public nuisance statute. 50 O.S.2011, § 2.

¶18 For the past 100 years, our Court, applying Oklahoma's nuisance statutes, has limited Oklahoma public nuisance liability to defendants (1) committing crimes constituting a nuisance, or (2) causing physical injury to property or participating in an offensive activity that rendered the property uninhabitable.[13] When the Legislature reenacts a statute that has been previously construed by a court of last resort in the same or substantially the same terms, we presume the Legislature is familiar with its construction and adopted such construction as an integral part of the statute. Special Indem. Fund v. Bedford, 1993 OK 60, ¶ 8, 852 P.2d 150, 154. We are not limiting public nuisance to a defendant's use of real property as the Dissent asserts. This Court relies on Oklahoma precedent, and the limitations set by Oklahoma case law guide our consideration of whether J&J's conduct created a public nuisance.

¶19 The State's allegations in this case do not fit within Oklahoma nuisance statutes as construed by this Court. The Court applies the nuisance statutes to unlawful conduct that annoys, injures, or endangers the comfort, repose, health, or safety of others. But that conduct has been criminal or property-based conflict. Applying the nuisance statutes to lawful products as the State requests would create unlimited and unprincipled liability for product manufacturers; this is why our Court has never applied public nuisance law to the manufacturing, marketing, and selling of lawful products.[14]

II. OKLAHOMA'S PUBLIC NUISANCE LAW DOES NOT COVER THE STATE'S ALLEGED HARM. 

¶20 The central focus of the State's complaints is that J&J was or should have been aware and that J&J failed to warn of the dangers associated with opioid abuse and addiction in promoting and marketing its opioid products. This classic articulation of tort law duties--to warn of or to make safe--sounds in product-related liability.[15]

¶21 Public nuisance and product-related liability are two distinct causes of action, each with boundaries that are not intended to overlap. State v. Lead Indus. Ass'n, Inc., 951 A.2d 428, 456 (R.I. 2008). The Restatement explains as follows:

Tort suits seeking to recover for public nuisance have occasionally been brought against the makers of products that have caused harm, such as tobacco, firearms, and lead paint. These cases vary in the theory of damages on which they seek recovery, but often involve claims for economic losses the plaintiffs have suffered on account of the defendant's activities; they may include the costs of removing lead paint, for example, or of providing health care to those injured by smoking cigarettes. Liability on such theories has been rejected by most courts, and is excluded by this Section, because the common law of public nuisance is an inapt vehicle for addressing the conduct at issue. Mass harms caused by dangerous products are better addressed through the law of products liability, which has been developed and refined with sensitivity to the various policies at stake.

Restatement (Third) of Torts: Liab. for Econ. Harm § 8 cmt. g (Am. Law. Inst. 2020).

¶22 The U.S. Court of Appeals for the Eighth Circuit explained this concept in Tioga Public School District No. 15 of Williams County, State of North Dakota v. United States Gypsum Co., 984 F.2d 915 (8th Cir. 1993). The Tioga court examined North Dakota cases applying the state's nuisance statute and concluded that North Dakota courts only applied the statute in the classic context of a landowner or other person in control of property conducting an activity on his or her land in such a manner as to interfere with the property rights of a neighbor. Id. at 920. The Eighth Circuit determined that the North Dakota Supreme Court would not extend its nuisance statute--which is the source of, and remains identical to Oklahoma's nuisance statute, see O.S. 1910, §§ 4250-4251 (citing Dakota Terr. Comp. Laws §§ 4681-4682 (1887))--to cases involving the sale of products. Id. In reaching its decision, the Tioga court warned:

Under Tioga's theory, any injury suffered in North Dakota would give rise to a cause of action under [its nuisance statute] regardless of the defendant's degree of culpability or of the availability of other traditional tort law theories of recovery. Nuisance thus would become a monster that would devour in one gulp the entire law of tort, a development we cannot imagine the North Dakota legislature intended when it enacted the nuisance statute.

Tioga, 984 F.2d at 921. And the court refused to extend public nuisance liability to harms caused by asbestos.

¶23 We agree with the Tioga court's analysis of nuisance law and the sale of products. Public nuisance is fundamentally ill-suited to resolve claims against product manufacturers, including J&J in this case.[16] In reaching this decision, we identify three reasons not to extend public nuisance law to envelop J&J's conduct as an opioid manufacturer: (1) the manufacture and distribution of products rarely cause a violation of a public right, (2) a manufacturer does not generally have control of its product once it is sold, and (3) a manufacturer could be held perpetually liable for its products under a nuisance theory. We address each in turn.

A. The manufacture and distribution of products rarely cause a violation of a public right. 

¶24 One factor in rejecting the imposition of liability for public nuisance in this case is that the State has failed to show a violation of a public right. A public nuisance involves a violation of a public right; a public right is more than an aggregate of private rights by a large number of injured people. See Territory v. Long Bell Lumber Co., 1908 OK 263, ¶ 23, 99 P. 911, 917; Restatement (Second) of Torts § 821B cmt. g (Am. Law. Inst. 1979); see also City of Chicago v. Am. Cyanamid Co., 823 N.E.2d 126, 131 (Ill. 2005) (holding a public right is not "an assortment of claimed private individual rights"). Rather, a public right is a right to a public good, such as "an indivisible resource shared by the public at large, like air, water, or public rights-of-way." Am. Cyanamid Co., 823 N.E.2d at 131. Unlike an interference with a public resource,

[t]he manufacture and distribution of products rarely, if ever, causes a violation of a public right as that term has been understood in the law of public nuisance. Products generally are purchased and used by individual consumers, and any harm they cause--even if the use of the product is widespread and the manufacturer's or distributor's conduct is unreasonable--is not an actionable violation of a public right. . . . The sheer number of violations does not transform the harm from individual injury to communal injury.

Donald Gifford, Public Nuisance as a Mass Products Liability Tort, 71 U. Cin. L. Rev. 741, 817 (2003); see also Lead Indus. Ass'n, Inc., 951 A.2d at 448, 454 (holding the right of a child to not be poisoned by lead is a nonpublic right). The damages the State seeks are not for a communal injury but are instead more in line with a private tort action for individual injuries sustained from use of a lawful product and in providing medical treatment or preventive treatment to certain, though numerous, individuals.

¶25 The State characterizes its suit as an interference with the public right of health. We disagree with the State's characterization. See City of St. Louis v. Benjamin Moore & Co., 226 S.W.3d 110, 116 (Mo. 2007) (en banc) (rejecting the city's argument that its nuisance claim regarding lead paint was an injury to public health). This case does not involve a comparable incident to those in which we have anticipated that an injury to the public health would occur, e.g., diseased animals, pollution in drinking water, or the discharge of sewer on property. See Okla. Water Res. Bd. v. Tex. Cty. Irrigation & Water Res. Ass'n, 1984 OK 96, ¶ 15, 711 P.2d 38, 44; City of Okla. City v. West, 1931 OK 693, ¶ 15, 7 P.2d 888, 893; One Hudson Super-Six Auto., Model J, No. 4197, Engine No. 39527 v. State, 1920 OK 50, ¶ 21, 187 P. 806, 810. Such property-related conditions have no beneficial use and only cause annoyance, injury, or endangerment. In this case, the lawful products, prescription opioids, have a beneficial use in treating pain.

¶26 We consider City of Chicago v. Berreta U.S.A. Corp., 821 N.E.2d 1099 (Ill. 2004), instructive on this issue. In Berreta, the City of Chicago and Cook County brought public nuisance claims against manufacturers, distributors, and dealers of handguns. The city and county alleged that the manufacturing defendants knowingly oversupplied the market with their products and marketed their products to appeal to those who intended to use them for criminal purposes. Id. at 1108. The state and county sought compensation for the abatement of the nuisance, including costs of medical services, law enforcement efforts, and prosecutions for violations of gun control ordinances. Id. at 1106. The Illinois Supreme Court rejected these claims and sustained the trial court's dismissal of the public nuisance claims. The court acknowledged "[t]he tragic personal consequences of gun violence are inestimable." Id. at 1105. However, the state and county failed to show an unreasonable interference with a public right. Id. at 1116. The Berreta court ultimately concluded that a public right to be free from the threat that others "may defy [criminal] laws would permit nuisance liability to be imposed on an endless list of manufacturers, distributors, and retailers of manufactured products." Id. It acknowledged the far-reaching effects of a decision otherwise:

If there is a public right to be free from the threat that others may use a lawful product to break the law, that right would include the right to drive upon the highways, free from the risk of injury posed by drunk drivers. This public right to safe passage on the highways would provide the basis for public nuisance claims against brewers and distillers, distributing companies, and proprietors of bars, taverns, liquor stores, and restaurants with liquor licenses, all of whom could be said to contribute to an interference with the public right.

Id. Similarly, a public right to be free from the threat that others may misuse or abuse prescription opioids--a lawful product--would hold manufacturers, distributors, and prescribers potentially liable for all types of use and misuse of prescription medications. Just as in Beretta, the State has failed to show a violation of a public right in this case. Id. at 1116 (holding "there is no authority for the unprecedented expansion of the concept of public rights to encompass the right asserted by plaintiffs"). And as the manufacture and distribution of products rarely cause a violation of a public right, we refuse to expand public nuisance to claims against a product manufacturer.

B. A manufacturer does not have control of its product once it is sold.

¶27 Another factor in rejecting the imposition of liability for public nuisance in this case is that J&J, as a manufacturer, did not control the instrumentality alleged to constitute the nuisance at the time it occurred. See, e.g., City of Manchester v. Nat'l Gypsum Co., 637 F. Supp. 646, 656 (D.R.I. 1986). The State asks this Court to broadly extend the application of the nuisance statute, namely to a situation where a manufacturer sold a product (for over 20 years) that was later alleged to constitute a nuisance. See Tioga, 984 F.2d at 920. A product manufacturer's responsibility is to put a lawful, non-defective product into the market. There is no common law tort duty to monitor how a consumer uses or misuses a product after it is sold.[17] Without control, a manufacturer also cannot remove or abate the nuisance--which is the remedy the State seeks from J&J in this case. See, e.g., Tioga, 984 F.2d at 920.[18]

¶28 A public nuisance claim against a gun manufacturer parallels the State's claims against J&J and its opioid production and distribution. We again find Beretta persuasive as it discussed a manufacturer's control of its product in determining public nuisance liability. Federal and state laws regulate the manufacture, distribution, and use of both firearms and opioids. As in Beretta, the alleged nuisance in this case is several times removed from the initial manufacture and distribution of opioids by J&J. See Beretta, 821 N.E.2d at 1137. Multiple agencies and boards across different jurisdictions oversee and enforce statutes and regulations that control the developing, testing, producing, manufacturing, distributing, labeling, advertising, prescribing, selling, possessing, and reselling of prescription opioids; this is a highly regulated industry.

¶29 J&J had no control of its products through the multiple levels of distribution, including after it sold the opioids to distributors and wholesalers, which were then dispersed to pharmacies, hospitals, and physicians' offices, and then prescribed by doctors to patients. J&J also had no control over the laws and regulations that govern the disbursement of its prescription opioids or whether prescribers follow the laws. Regulation of prescription opioids belongs to the federal and state legislatures and their agencies. For example, the Oklahoma Legislature passed the Anti-Drug Diversion Act, 63 O.S.Supp.2020, § 2-309A et seq., requiring among other things that all "dispenser[s] of a Schedule II, III, IV or V controlled dangerous substance dispensed pursuant to a valid prescription" to send that information to a central depository, as controlled by the Oklahoma State Bureau of Narcotics and Dangerous Drugs Control. 63 O.S.2011, § 2-309C. This is known as Oklahoma's Prescription Monitoring Program and allows prescribers to check the prescription history of their patients to determine if the patient has recently obtained identical prescriptions from other doctors. This is just one example of legislation governing prescription opioids over which J&J has no control.

¶30 Even with its influential marketing, J&J ultimately could not control: (1) how wholesalers distributed its products, (2) how regulations and legislation governed the distribution of its products by prescribers and pharmacies; (3) how doctors prescribed its products, (4) how pharmacies dispersed its products, and (5) how individual patients used its product or how a patient responded to its product, regardless of any warning or instruction given.[19] Just as in Berreta, J&J did not control the instrumentality (prescription opioids) alleged to constitute the nuisance at the time the nuisance occurred. See Beretta, 821 N.E.2d at 1138.

¶31 Even more, J&J could not control how individuals used other pharmaceutical companies' opioids. A manufacturer traditionally does not have a duty to people who use other manufacturers' products.[20] Evidence at trial demonstrated that J&J sold only 3% of all prescription opioids statewide; other pharmaceutical companies were responsible for marketing and selling 97% of the prescription opioids. Yet the district court held J&J responsible for those alleged losses caused by other pharmaceutical companies' opioids. Where the law does not expressly allow, J&J should not be responsible for the harms caused by opioids that it never manufactured, marketed, or sold. To expand public nuisance to cover a manufacturer's production and sale of a product would cause the manufacturer to be responsible for products it did not produce. We refuse to expand Oklahoma's nuisance law so greatly.

¶32 Further, J&J cannot abate the alleged nuisance. The condition, opioid use and addiction, would not cease to exist even if J&J pays for the State's Abatement Plan. See, e.g., id. at 1137 (holding the nuisance would not cease to exist even if the defendants stopped selling firearms). The State's Abatement Plan is not an abatement in that it does not stop the act or omission that constitutes a nuisance. The abatement is not the opioids themselves. Neither is it an injunction to halt the promoting and marketing of opioids as J&J has not promoted opioids for several years. It is instead an award to the State to fund multiple governmental programs for medical treatment and preventive services for opioid abuse, investigatory and regulatory activities, and prosecutions for violations of Oklahoma law regarding opioid distribution and use--activities over which J&J has no control. Our Court, over the past 100 years in deciding nuisance cases, has never allowed the State to collect a cash payment from a defendant that the district court line-item apportioned to address social, health, and criminal issues arising from conduct alleged to be a nuisance. We therefore reject the district court's remedy in this case as it does not abate the alleged nuisance; it does not abate the opioid epidemic, any act or omission of J&J, or any act or omission of other opioid manufacturers.

C. A manufacturer cannot be held perpetually liable for its products.

¶33 The final factor in rejecting the imposition of liability for public nuisance in this case is the possibility that J&J could be held continuously liable for its products. Nuisance claims against products manufacturers sidestep any statute of limitations. See, e.g., Detroit Bd. of Educ. v. Celotex Corp., 493 N.W.2d 513, 521 (Mich. Ct. App. 1992). In this case, the district court held J&J responsible for products that entered the stream of commerce more than 20 years ago, shifting the wrong from the manufacturing, marketing, or selling of a product to its continuing presence in the marketplace. The State's public nuisance claims could hold manufacturers perpetually liable for their products; Oklahoma law has rejected such endless liability in all other traditional tort law theories.[21] We again reject perpetual liability here.

III. THIS COURT WILL NOT EXTEND OKLAHOMA PUBLIC NUISANCE LAW TO THE MANUFACTURING, MARKETING, AND SELLING OF PRESCRIPTION OPIOIDS.

¶34 Extending public nuisance law to the manufacturing, marketing, and selling of products--in this case, opioids--would allow consumers to "convert almost every products liability action into a [public] nuisance claim." Cty. of Johnson v. U.S. Gypsum Co., 580 F. Supp. 284, 294 (E.D. Tenn. 1984). As one court explained:

All a creative mind would need to do is construct a scenario describing a known or perceived harm of a sort that can somehow be said to relate back to the way a company or an industry makes, markets and/or sells its non-defective, lawful product or service, and a public nuisance claim would be conceived and a lawsuit born.

New York ex rel. Spitzer v. Sturm, Ruger & Co., 761 N.Y.S.2d 192, 196 (App. Div. 2003).

¶35 Other jurisdictions have refused to allow products-based public nuisance claims, signaling a clear national trend to limit public nuisance to land or property use. See, e.g., Beretta, 821 N.E.2d at 1116; In re Lead Paint Litig., 924 A.2d at 505 (ruling "were we to permit these complaints to proceed, we would stretch the concept of public nuisance far beyond recognition and would create a new and entirely unbounded tort antithetical to the meaning and inherent theoretical limitations of the tort of public nuisance"); Hamilton v. Beretta U.S.A. Corp., 750 N.E.2d 1055 (N.Y. 2001) (rejecting the contention that gun manufacturers have a general duty to lessen the risk of illegal gun trafficking because they have the power to restrict marketing and product distribution); Sturm, Ruger & Co., Inc., 761 N.Y.S.2d at 196 (ruling "giving a green light to a common-law public nuisance cause of action will, in our judgment, likely open the courthouse doors to a flood of limitless, similar theories of public nuisance, not only against these defendants, but also against a wide and varied array of other commercial and manufacturing enterprises and activities"); Lead Indus. Ass'n, Inc., 951 A.2d at 456 (holding "[t]he law of public nuisance never before has been applied to products, however harmful"); see also, e.g., Sills v. Smith & Wesson Corp., No. 99C-09-283-FSS, 2000 WL 33113806 (Del. Super. Ct. Dec. 1, 2000) (unpublished) (holding the design, marketing, and advertising of handguns was not a public nuisance because the state did not recognize a cause of action for public nuisance based upon products).

¶36 In the same way, this Court will not extend Oklahoma public nuisance law to J&J's conduct in the manufacturing, marketing, and selling of prescription opioids. We follow North Dakota and South Dakota courts who rejected public nuisance claims against the same defendants for the same conduct as complained of in this case. Although unpublished opinions, we find both courts' reasonings for dismissing the claims persuasive as the courts applied nuisance statutes identical to Oklahoma's nuisance statute.[22] The North Dakota court dismissed the case because public nuisance law does not apply to cases involving the sale of goods. State ex rel. Stenehjem v. Purdue Pharma, L.P., No. 08-2018-cv-01300, 2019 WL 2245743, at *13 (N.D. Dist. Ct. May 10, 2019). The South Dakota court dismissed the public nuisance claim based on the same reason as the North Dakota court and held the defendants did not have control of the instrumentality of the nuisance when the damage occurred. Tr. of Bench Decision at 17-24, State ex rel. Ravnsborg v. Purdue Pharma L.P., No. 32CIV18-000065 (S.D. Cir. Ct. Jan. 13, 2021) (Appellants' App. in Supp. of Rep. Br. and Answer Br. to Counter-Appeal 169-71).

¶37 The common law criminal and property-based limitations have shaped Oklahoma's public nuisance statute. Without these limitations, businesses have no way to know whether they might face nuisance liability for manufacturing, marketing, or selling products, i.e., will a sugar manufacturer or the fast food industry be liable for obesity, will an alcohol manufacturer be liable for psychological harms, or will a car manufacturer be liable for health hazards from lung disease to dementia or for air pollution. We follow the limitations set by this Court for the past 100 years: Oklahoma public nuisance law does not apply to J&J's conduct in manufacturing, marketing, and selling prescription opioids.

CONCLUSION

¶38 This case challenges us to rethink traditional notions of liability and causation. Tort law is ever-changing; it reflects the complexity and vitality of daily life.[23] The State presented us with a novel theory--public nuisance liability for the marketing and selling of a legal product, based upon the acts not of one manufacturer, but an industry. However, we are unconvinced that such actions amount to a public nuisance under Oklahoma law.

¶39 The Court has allowed public nuisance claims to address discrete, localized problems, not policy problems. Erasing the traditional limits on nuisance liability leaves Oklahoma's nuisance statute impermissibly vague.[24] The district court's expansion of public nuisance law allows courts to manage public policy matters that should be dealt with by the legislative and executive branches; the branches that are more capable than courts to balance the competing interests at play in societal problems. Further, the district court stepping into the shoes of the Legislature by creating and funding government programs designed to address social and health issues goes too far. This Court defers the policy-making to the legislative and executive branches and rejects the unprecedented expansion of public nuisance law. The district court erred in finding J&J's conduct created a public nuisance.

DISTRICT COURT'S JUDGMENT REVERSED.

Darby, C.J., Kane, V.C.J., Winchester, Gurich, and Kuehn (by separate writing), JJ., concur.

Edmondson, J. (by separate writing), dissents.

Kauger and Combs, JJ., disqualified.

Rowe, J., recused.

FOOTNOTES

[1] See Emily Piercefield, MD, DVM, Pam Archer, MPH, Philip Kemp, Ph.D. & Sue Mallonee, RN, MPH, Increase in Unintentional Medication Overdose Deaths Oklahoma, 1994-2006, 39 Am. J. Preventive Med. 357, 357-59 (Oct. 2010), available at https://www.ajpmonline.org/article/S0749-3797(10)00389-2/pdf; John Scully, Okla. Bureau of Narcotics, Oklahoma Drug Threat Assessment 1 (2017), available at https://www.obndd.ok.gov/home/showpublisheddocument/20/637395998276800000.

[2] See U.S. Food & Drug Admin., A Guide to Safe Use of Pain Medications 3 (February 23, 2009), available at https://portal.ct.gov/-/media/Departments-and-Agencies/DPH/dph/environmental_
health/occupationalhealth/Opioid-Symposium-March-2017/FDA-Guide-to-Safe-Use-of-Pain-Medicine.pdf.

[3] The Drug Enforcement Administration ("DEA") classifies drugs that contain controlled substances into five "schedules" based on currently accepted medical use in the U.S. and abuse potential. Schedule I controlled substances have no accepted medical use. Schedules II through V controlled substances do have medical use but range from high potential for abuse (Schedule II) to low potential for abuse (Schedule V). See, e.g., Uniform Controlled Dangerous Substances Act, 63 O.S., §§ 2-201 to -212.

[4] See Duragesic Label 3, available at https://www.accessdata.fda.gov/drugsatfda_docs/label/ 2005/19813s039lbl.pdf. The Court notes that Fentanyl is a synthetic opioid used as a surgical anesthetic and intravenous pain reliever for postoperative pain; it is not an illicit drug.

[5] See Nucynta ER, Highlights of Prescribing Information, 1 (2018), available at https://www.nucynta.com/assets/pdf/Nucynta%20IR%20for%20web_02d.pdf.

[6] See Ultram ER, Highlights of Prescribing Information 1 (2017), available at https://www.
accessdata.fda.gov/drugsatfda_docs/label/2017/021692s015lbl.pdf.

[7] The district court's judgment recognizes that J&J formerly owned two companies that produced and sold opioid raw materials and active pharmaceutical ingredients (APIs) used in opioid medications. The DEA authorized the sales of the raw materials under a federal regulatory scheme. The State conceded that the federally controlled sale of opioid raw materials and APIs was not a basis for imposing liability. The companies formerly owned by J&J also did not manufacture, promote, or sell J&J's opioid medications at issue in this case, and the Court agrees that the sale of raw materials and APIs are not a basis for imposing liability in this case.

[8] The State sued Johnson & Johnson, Janssen Pharmaceuticals, Inc., Ortho-McNeil Janssen Pharmaceuticals, Inc., n/k/a Janssen Pharmaceuticals, Inc., and Janssen Pharmaceutica, Inc., n/k/a Janssen Pharmaceuticals, Inc.

[9] The State sued Purdue Pharma L.P., Purdue Pharma, Inc., and The Purdue Frederick Company.

[10] The State sued Teva Pharmaceuticals USA, Inc., Cephalon, Inc., Allergan, PLC, f/k/a Actavis, PLC, f/k/a Actavis, Inc., f/k/a Watson pharmaceuticals, Inc., Watson Laboratories, Inc., Actavis LLC; and Actavis Pharma, Inc., f/k/a Watson Pharma, Inc.

[11] The State settled with Purdue for $270 million, and the State settled with Teva for $85 million.

[12] The district court appropriated the funds to the following governmental programs:

 
 
 
 Opioid Use Disorder Treatment Program
 
 
 $232,947,710
 
 
 
 
 Addiction Treatment -- Supplementary Services
 
 
 $ 31,769,011
 
 
 
 
 Public Medication and Disposal Programs
 
 
 $ 139,883
 
 
 
 
 Screening, Brief Intervention and Referral to Treatment (SBIRT) Program
 
 
 $ 56,857,054
 
 
 
 
 Pain Prevention and Non-Opioid Pain Management Therapies
 
 
 $103,277,835
 
 
 
 
 Expanded and Targeted Naloxone Distribution and Overdose Prevention Education
 
 
 $ 1,585,797
 
 
 
 
 Medical Case Management/Consulting (Project Echo)
 
 
 $ 3,953,832
 
 
 
 
 Developing and Disseminating NAS Treatment Evaluation and Standards
 
 
 $ 107,683
 
 
 
 
 Development of NAS as a Required Reportable Condition
 
 
 $ 181,983
 
 
 
 
 Implementing Universal Substance Use Screening for Pregnant Women
 
 
 $ 1,969,000
 
 
 
 
 Medical Treatment for Infants Born with NAS or Opioid Withdrawal
 
 
 $ 20,608,847
 
 
 
 
 Investigatory and Regulatory Actions
 
 
 $ 500,000
 
 
 
 
 Additional Staffing for OBN

 Additional Staffing for Oklahoma Licensure Boards

 Additional Staffing for Oklahoma Veterinary Board

 Additional Staffing for Oklahoma State Osteopathic Board

 Additional Staffing for Oklahoma Board of Nursing

 Additional Staffing for Oklahoma Board of Medical Licensure and Supervision

 Additional Staffing for Oklahoma Board of Dentistry

 Additional Staffing for Office of the Chief Medical Examiner

 Additional Staffing for Office of the Attorney General

 Additional Staffing for Medicaid Fraud Control Unit
 
 
 $ 11,101,076
 
 
 
 
 TOTAL
 
 
 $465,026,711
 
 
 

[13] See, e.g., Nichols, 1996 OK 118, 933 P.2d 272 (pollution from a leaking oil pipeline considered a public nuisance); Sharp v. 251st St. Landfill, Inc., 1991 OK 41, 810 P.2d 1270 (pollution in water from a waste disposal facility considered a public nuisance); State ex rel. Fallis v. Mike Kelly Constr. Co., 1981 OK 158, 638 P.2d 455 (open saloon in violation of Oklahoma law not considered a public nuisance); State ex rel. Field v. Hess, 1975 OK 123, 540 P.2d 1165 (obscene works in violation of Oklahoma law considered a public nuisance); Mackey v. State ex rel. Harris, 1972 OK 37, 495 P.2d 105 (conduct outside of saloon considered a public nuisance); Phillips v. Altman, 1966 OK 46, 412 P.2d 199 (pollution by crude oil considered a public nuisance); Crushed Stone Co. v. Moore, 1962 OK 65, 369 P.2d 811 (limestone quarry dust considered a public nuisance); Boudinot v. State ex rel. Cannon, 1959 OK 97, 340 P.2d 268 (forty cats in a home considered a public nuisance); Updegraff v. City of Norman, 1955 OK 195, 287 P.2d 909 (overgrown hedges obstructing street considered a public nuisance); State ex rel. Brown v. Armstrong, 1952 OK 70, 241 P.2d 959 (barn in disrepair considered a public nuisance); Peerson v. Mitchell, 1950 OK 329, 239 P.2d 1028 (harboring a vicious dog in violation of Oklahoma law considered a nuisance); Goodall v. City of Clinton, 1945 OK 235, 161 P.2d 1011 (installation of toilets causing sewage backflow and pollution to city water considered a public nuisance); City of Oklahoma City v. West, 1931 OK 693, 7 P.2d 888 (dumping of untreated sewage considered a public nuisance); McNulty v. State ex rel. Seaver, 1923 OK 509, 217 P. 467 (gambling on dog races in violation of Oklahoma law considered a public nuisance); Jones v. State, 1912 OK 806, 132 P. 319 (gambling on horse races in violation of Oklahoma law considered a public nuisance); State ex rel. West v. State Capital Co., 1909 OK 200, 103 P. 1021 (advertising liquor in violation of Oklahoma law was not a nuisance); Territory v. Long Bell Lumber Co., 1908 OK 263, 99 P. 911 (monopoly in violation of Oklahoma law was a nuisance); see also Swanson v. City of Tulsa, 1981 OK CR 101, 633 P.2d 1256 (smoking indoors in violation of Oklahoma law considered a public nuisance); Gordon v. State, 1955 OK CR 100, 289 P.2d 396 (dance hall activities in violation of Oklahoma law considered a public nuisance).

[14] The cases where this Court has considered whether a defendant was liable for public nuisance involving the marketing or selling of goods was when the marketing or selling of that product was illegal. See, e.g., Hess, 1975 OK 123, 540 P.2d 1165; State Capital Co., 1909 OK 200, 103 P. 1021.

[15] See, e.g., Kirkland v. Gen. Motors Corp., 1974 OK 52, ¶ 0, 521 P.2d 1353, 1355 (Syllabus by the Court) (adopting the Restatement (Second) of Torts § 402A (Am. Law Inst. 1965)); Cunningham v. Charles Pfizer & Co., Inc., 1974 OK 146, ¶¶ 24-32, 532 P.2d 1377, 1380-81 (holding that the "defendant had a duty to warn plaintiff or his parents of the risk of contracting polio from the vaccine and the failure to warn of this risk rendered the vaccine defective within the meaning of [the Restatement (Second) of Torts] § 402A").

[16] A leading treatise states:

A product which has caused injury cannot be classified as a nuisance to hold liable the manufacturer or seller for the product's injurious effects, since a defendant who does not control the enterprise in which the product is used is not in the situation of one who creates a nuisance; consequently, negligent manufacture or failure to warn of product-caused dangers does not give rise to a nuisance cause of action.

Charles J. Nagy, Jr., American Law of Products Liability § 1:19 (3d ed. 2021).

[17] See Bloomington v. Westinghouse Elec. Corp., 891 F.2d 611, 614 (7th Cir.1989) (noting the absence of cases "holding manufacturers liable for public or private nuisance claims arising from the use of their product subsequent to the point of sale"); see also Gifford, Public Nuisance as a Mass Products Liability Tort, 71 U. Cin. L. Rev. at 820 ("The essence of public nuisance law . . . is ending the harmful conduct. This is impossible for the manufacturer or distributor who has relinquished possession by selling or otherwise distributing the product."); Victor E. Schwartz & Phil Goldberg, The Law of Public Nuisance: Maintaining Rational Boundaries on a Rational Tort, 45 Washburn L.J. 541, 568 (2006) ("[F]urnishing a product or instrumentality--whether it be chemicals, asbestos, guns, lead paint, or other products--is not the same as having control over that instrumentality.").

[18] A seller loses control of its products when they are sold and "lacks the legal right to abate whatever hazards its products may pose; under these circumstances, the purchaser's proper remedies are products liability actions for negligence or breach of warranty rather than a nuisance action." 63A Am. Jur. 2d Products Liability § 867 (2021).

[19] See also State ex rel. Stenehjem v. Purdue Pharma, L.P., No. 08-2018-cv-01300, 2019 WL 2245743, at *13 (N.D. Dist. Ct. May 10, 2019) (holding that "Purdue has no control over its product after it is sold to distributors, then to pharmacies, and then prescribed to consumers, i.e. after it enters the market")

[20] See Honorable Luther J. Strange III, A Prescription for Disaster: How Local Governments' Abuse of Public Nuisance Claims Wrongly Elevates Courts and Litigants into A Policy-Making Role and Subverts the Equitable Administration of Justice, 70 S.C. L. Rev. 517, 537 (2019).

[21] For example, a typical Oklahoma negligence action and products liability action have a statute of limitations of two years. 12 O.S.2011, § 95(a)(3); Kirkland, 1974 OK 52, ¶ 24, 521 P.2d at 1362. 

[22] North Dakota's nuisance statute states:

A nuisance consists in unlawfully doing an act or omitting to perform a duty, which act or omission:

1. Annoys, injures, or endangers the comfort, repose, health, or safety of others;
2. Offends decency;
3. Unlawfully interferes with, obstructs or tends to obstruct, or renders dangerous for passage, any lake, navigable river, bay, stream, canal, basin, public park, square, street, or highway; or
4. In any way renders other persons insecure in life or in the use of property.

N.D. Cent. Code. § 42-01-01 (2021). North Dakota defines public nuisance as follows:

A public nuisance is one which at the same time affects an entire community or neighborhood or any considerable number of persons, although the extent of the annoyance or damage inflicted upon the individuals may be unequal.

N.D. Cent. Code. § 42-01-06 (2021).

South Dakota's nuisance statute states:

A nuisance consists in unlawfully doing an act, or omitting to perform a duty, which act or omission either:

(1) Annoys, injures, or endangers the comfort, repose, health, or safety of others;
(2) Offends decency;
(3) Unlawfully interferes with, obstructs, or tends to obstruct, or renders dangerous for passage, any lake or navigable river, bay, stream, canal, or basin, or any public park, square, sidewalk, street, or highway;
(4) In any way renders other persons insecure in life, or in the use of property.

S.D. Codified Laws § 21-10-1 (2021). South Dakota defines public nuisance as follows:

A public nuisance is one which affects at the same time an entire community or neighborhood, or any considerable number of persons, although the extent of the annoyance or damage inflicted upon the individuals may be unequal. Every other nuisance is private.

S.D. Codified Laws § 21-10-3 (2021).

[23] Hamilton, 750 N.E.2d at 1068.

[24] See, e.g., Sessions v. Dimaya, 138 S. Ct. 1204, 1212 (2018) (holding statutes must be clear enough to give ordinary people fair note of the conduct a statute proscribes and to prevent arbitrary enforcement).

 

 

KUEHN, J., SPECIALLY CONCURRING:

¶1 I agree with the Majority's analysis and conclusion and write to discuss why Oklahoma nuisance law is not, and unless the Legislature amends it, never will be, a tort.

¶2 The main argument on appeal is simple. Can judges read the plain meaning of the public nuisance statute to include actions that lie in tort theory? Jurists typically look to legislative history behind a vague or broad statute to determine the legislature's intent, but that is not an option here. There is no legislative history because three years after statehood, the legislature codified common law public nuisance. This statute has been amended once and only to add an agricultural exception. It was not amended during or after the 1970s movement to expand public nuisance, broadening its meaning to fit environmental tort claims.[1] Without history to consider, the Court should look to the common law meaning of a public nuisance.[2]

¶3 Oklahoma public nuisance law involves injury to public property and a private person's lack of capacity to correct that harm. 50 O.S. §§ 1, 2. The State of Oklahoma sues to abate the wrong and ensure the elimination of the public nuisance. 50 O.S. § 11. A public nuisance is a criminal misdemeanor with a penalty under 21 O.S. § 1191.

¶4 Understanding the plain language of the public nuisance statute, the Majority correctly finds that marketing a product is not within that definition. I am concerned that, because some believe the statutory language is vague, it leads to any interpretation of what a public nuisance can be, including marketing a product. The Legislature should consider reexamining the public nuisance statute to prevent further misapplications. If the public nuisance law can be broadly interpreted as is suggested by the Appellants, I believe the law will become the newest fictional shape-shifting monster.

¶5 Halting the opioid crisis and making victims whole is a laudable goal. However, it cannot be attained by reshaping public nuisance law through the judicial branch. Revisions of a statute made by any branch other than the Legislature and not anticipated by the public deprive persons of due process. Filing lawsuits using these unanticipated broad interpretations allows the courts, not the Legislature, to dictate public policy. The Majority recognizes that tort laws with due process considerations exist to make injured persons whole. Therefore, a need to be creative with public nuisance is unnecessary. "There is a reason why all things are as they are." Bram Stoker, Dracula (1897). The Majority rightly leaves public nuisance within its common law meaning.

FOOTNOTES

[1] See Schwartz, et al., Game Over? Why Recent Supreme Court Decisions Should End the Attempted Expansion of Public Nuisance Law, 62 Okla. Law Rev. 629, 636-39 (2010).

[2] See Thomas W. Merrill, Is Public Nuisance a Tort?, 4 J. Tort L. 1, 11-12 (2011)(when criminal liability is grounded in public nuisance law, it reinforces public nuisance as a public action and not a tort).

 

 

EDMONDSON, J., DISSENTING:

I. Introduction

¶1 I disagree with the Court's analysis, but I also disagree with the District Court's judgment. The judgment of the District Court should be reversed and the matter remanded for a correct determination of a public nuisance and damages.

¶2 The District Court's findings of fact are sufficient to show the Attorney General possessed a cause of action for a public nuisance common-law action. However, The District Court's findings include matters extraneous to the trial defendants' conduct in Oklahoma, and the findings refer to manufacturing and marketing opioids in the United States by the defendants. The public nuisance cause of action in this case must be limited to wrongful conduct by the specific trial defendants when marketing their opioid products in Oklahoma. The public nuisance cause of action in this case is based upon the defendants' marketing scheme which was based upon different types of false representations concerning the safety of their products when prescribed by physicians. These false representations must have been made in Oklahoma or made elsewhere for the purpose of physicians in Oklahoma relying upon them when prescribing the opioids for their patients in Oklahoma. The District Court did make findings stating the defendants' "marketing and promotional efforts were designed to reach Oklahoma doctors through multiple means and at multiple times...intended to influence the prescribing behavior of physicians and, thus, increase Defendants' profits from opioids."[1] Oklahoma doctors testified they relied upon misleading information from defendants for the purpose of prescribing opioids, and they would not prescribe in the same circumstances based upon that information today.[2]

¶3 The trial court's judgment states the parties agree that from 1994 to 2006 the opioid prescription sales increased four-fold in Oklahoma, and this period occurred when defendants were making false and misleading statements for the purpose of increasing prescription sales. However, the wrongful conduct (false safety representations) by these trial defendants was not the only cause constituting damage to public health in the form of contributing to opioid addiction disease in Oklahoma. The State settled claims with other opioid manufacturers. A nuisance action is in equity, and our society's concept of equity includes the idea that a defendant should be held legally responsible for damages proximately caused by that defendant and not others. We also see this concept in modern contribution and comparative negligence statutes. Again, the legal liability of Johnson & Johnson and its associated entities must be tied to conduct of these specific defendants and damages they caused in Oklahoma. The common law on this side of the Atlantic provided that: "While, as we have seen, an equitable action will lie to restrain parties who severally contribute to a nuisance, the general rule is well settled that where different parties are engaged in polluting or obstructing a stream, at different times and places, the whole damages occasioned by such wrongful acts cannot be collected of one of the parties." Chipman v. Palmer, 32 Sickels 51, 77 N.Y. 51, 56 (1879).[3] Our Legislature has provided the following.

A. In any civil action based on fault and not arising out of contract, the liability for damages caused by two or more persons shall be several only and a joint tortfeasor shall be liable only for the amount of damages allocated to that tortfeasor.

B. This section shall not apply to actions brought by or on behalf of the state.

C. The provisions of this section shall apply to all civil actions based on fault and not arising out of contract that accrue on or after November 1, 2011.

23 O.S.2011 § 15. This statute applies to a "joint tortfeasor." Our law distinguishes joint tortfeasors (concerted action with unified purpose), concurrent (independent acts causing a single indivisible injury), and successive tortfeasors as well.[4] No evidence was before the trial court showing the trial defendants to be joint tortfeasors with a unified purpose causing injury in concert with other opioid manufacturers, and the statute states it does not apply to actions brought by the State.

¶4 Appellant, Johnson & Johnson (J & J), argues on appeal it should have been given a jury trial. Because the Attorney General's evidence is designed for damages and is not a case for abatement, and I would reverse the judgment and remand for the purpose of a properly instructed jury to determine the existence of a public nuisance in Oklahoma which was created, at least in part, by defendants' wrongful conduct, and the amount of damages caused by that conduct.[5] Additionally, the District Court used a legislatively-created scheme relating to the public costs to treat current opioid addiction. No findings were made linking the extent of addiction and public costs of treatment (damages) to J & J's wrongfully marketed products in Oklahoma.

¶5 I have several points of disagreement with the Court's analysis, and a few of them merit comment. The Court fails to recognize the scope of a common-law public nuisance action. J & J argues on appeal a nuisance cause of action must have a nexus or connection to real property. The Court's opinion states our nuisance statute applies to "unlawful conduct that annoys, injures, or endangers the comfort, repose, health, and safety of others." I agree. The Court next observes "that conduct has been criminal or property-based conflict." Opin. at ¶ 19. I agree our prior cases have discussed nuisance in criminal and property-based conflicts. However, the Court's analysis suddenly stops at this point and fails to explain a property-based nexus, while necessary in a private nuisance cause of action, is not always a required element in a public nuisance common-law action. In other words, a common-law public nuisance may be created using a chattel or personal property as a means or instrument which causes an injury to a public right, and this type of action has been incorporated into our nuisance statute, 50 O.S. 2011, § 1. In application, J & J's directed use of their personal property or goods in Oklahoma commerce, when combined with J & J's false and misleading safety representations of those goods, constitutes a public nuisance when those misrepresentations are causally linked to harm suffered by the public in Oklahoma and resulting in expenditures from the Public Purse.

¶6 The Court points to the State's complaint that J & J failed to warn of the dangers associated with opioid abuse and addiction, and the Court states that such complaint of wrongful conduct is a classic articulation sounding "in product-related liability." Opin. at ¶ 20. The Court states "public nuisance and product-related liability are two distinct causes of action, each with boundaries that are not intended to overlap." Opin. at ¶ 21. I agree these two causes of action are distinct. However, the common law has recognized a defendant's wrongful conduct may be used as proof of an element in different types of actions. Courts have recognized this principle in various ways, including the cumulative-remedies doctrine. In other words, the Court's characterization does not distinguish between (1) different causes of action, which are indeed different and separate, and (2) underlying wrongful conduct which may give rise to different types of judicially cognizable actions. For example, when the common law provides in a circumstance a plaintiff may elect to sue in tort or contract,[6] we do not compel the plaintiff to sue using one particular theory merely because other people usually use that same theory in a similar circumstance.

¶7 The Court does not address the findings of fact made by the trial court relating to the misrepresentations made by the defendants, and the relationship between these misrepresentations and opioid addiction in Oklahoma. These misrepresentations were for the purpose of increasing physician prescriptions of opioids as safe products. The case in the trial court was not an example of post hoc ergo propter hoc, after this therefore because of this, but a case where opioid marketing informed physicians that a patient's pain was being undertreated and more opioid doses were needed for the patients. For example, one of the misrepresentations included the advice that patients "who exhibited signs of addiction--e.g., asking for 'higher and higher doses' of opioids or returning 'early' before a prescription should have run out--were not actually suffering from addiction, but from the undertreatment of pain; and the solution, according to Defendants' marketing, was to prescribe the patient more opioids."[7] Defendants' marketing characterized such patients as needing more opiates and as suffering from a "pseudoaddiction" and not an actual or real addiction.[8] The Court does not discuss the importance of a drug manufacturer deceptively marketing a drug to physicians for the purpose of increased sales, and causing injury to patients and a public health crisis with damage to the public's purse.

¶8 The State sued opioid manufacturers, and after settlements a trial was held with the remaining manufacturer/defendants. J & J and associated companies remained defendants at trial. The District Court found that J & J sold its Noramaco/Tasmanian Alkaloids businesses in 2016, and former employees "simultaneously held positions at multiple companies within the Johnson and Johnson family of companies at times." The trial court's findings include, but are not limited to: "Since at least the mid-1990s, Defendants have marketed, promoted and sold opioid drugs in Oklahoma." (2) Defendants specifically manufactured and sold their own branded opioid drugs as part of its pain franchise, including (i) Duragesic--a transdermal patch made out of the active pharmaceutical ingredient ('API'), fentanyl; (ii) Ultram and Ultram Extended Release ('(ER')--tablets made out of the API, tramadol; (iii) Ultracet--tablets made out of the APIs, tramadol and acetaminophen; (iv) Nucynta and Nuycynta ER--tablets made out of the API, tapentadol; (v) Tylenol wih Codeine--tablets made out of the APIs, acetaminophen and codeine; (vi) Tylox--capsules made out of the APIs, acetaminophen and oxycododone." As a part of its "pain management franchise," "from the 1990s through at least 2016, Defendants Johnson and Johnson wholly owned two subsidiaries that together, supplied other opioid manufacturers with opioid APIs to be used in opioid drugs."[9] The trial court's findings state these APIs were sold to other manufacturers in the United States.[10] I agree this trial did include activities of defendants in Oklahoma and activities directed to physicians and patients in Oklahoma, and damages must be based upon a connection between the conduct of the trial defendants and their conduct in Oklahoma.

II. Private Nuisance and Public Nuisance Causes of Action and Common Law

¶9 The Court characterizes the State's complaint as one usually addressed in a products liability cause of action. The Court does not give an opinion on whether the State ever had a products liability cause of action for the Attorney General to prosecute. The Court takes this characterization of alleged products liability wrongful conduct and concludes no public nuisance action is cognizable. When the Court makes a distinction between a public nuisance tort cause of action and products liability tort cause of action on the basis of the alleged wrongful conduct because such conduct may be remedied in one of these types of causes, and states this remedied wrong has the common-law (non-statutory)[11] legal effect of canceling the existence of the other cause of action, then the Court comes close to making a form of action define the scope of a party's legally cognizable common-law cause of action. This is so when the Court's distinction states because a product liability remedy exists in law for mass torts in a general sense, then such existence cancels, in a specific sense, a particular party's public nuisance common-law action when based upon the same remedied wrong as in the products liability action. But this Court has explained the practice of common-law forms of action defining a cause of action has long been abolished in this State, and Okla. Const. Art. 2, § 6 indicates that judicially cognizable wrongs are not defined by particular remedies.[12]

¶10 Our Legislature has defined a nuisance in 50 O.S. § 1. We have stated this statute "encompasses the common law's private and public nuisance concepts."[13] An analysis of what types of wrongful conduct are remedied by our nuisance statute must include an examination of the common law. We have explained: "The common law, which in this state remains in full force unless some legislative enactment explicitly provides otherwise, may not be viewed as having been abrogated either by silence or mere implication."[14] The Legislature's silence does not destroy a common-law remedy.[15] Of course, the Legislature has recognized the common law may be modified by judicial decisions.[16] Our Court has classified a nuisance as "a common-law tort."[17]

¶11 Our Court's opinion states the Court has not expressly authorized a public nuisance action based upon the sale of a commercial product facilitated by a seller's misrepresentations concerning the product's safety to the public. The Court uses this silence for concluding a nuisance action should not be based upon public harm caused by commercial products because such actions either did not exist in the common law or they are inconsistent with the scope of a common-law nuisance action. However, we have explained common-law remedies and actions are cumulative; and even when the Legislature provides a remedy by statute for a particular wrong the remedy is "merely cumulative," unless expressly or by implication declared exclusive by the statute.[18]

¶12 The Court notes for the purpose of its reasoning a silence in previous nuisance cases on the issue whether equivalent "products liability wrongful conduct" could also simultaneously be "public-nuisance wrongful conduct," and implies this history of silence constitutes a form of sub silentio[19] proof denying such equivalence. The Court states: "This Court relies on Oklahoma precedent, and the limitations set by Oklahoma case law guide our consideration of whether J&J's conduct created a public nuisance." Opin. at 18. I agree this Court relies on Oklahoma precedent; but Oklahoma precedent has never refused to allow a common-law public nuisance action based upon a defendant using personal property, goods, or chattels to create a public nuisance. Common-law remedies are not destroyed by mere silence from the Legislature or this Court when the silence occurs in a circumstance where no duty to speak is present.[20]

¶13 A summary of the common-law action for nuisance and its elements is instructive. An early common-law remedy for indirect damage to lands or an interference with its use and enjoyment later became the common-law action on the case for nuisance. Generally, the nuisance action provided damages for invasion of interests in the use and enjoyment of land, as well as easements and profits, and an abatement required resort to equity.[21] Professor Oldham explained an early form of the action required a defendant to abate the nuisance, and a "favorite form of action for nuisance during the thirteenth and fourteenth century" became an action that required a defendant to both "abate the nuisance and pay damages."[22] When courts eliminated the requirement of vi et armis (with force and arms), "the use of the action of trespass on the case for a variety of offences, including nuisance, grew rapidly."[23] Professor Oldham further explained this procedure had advantages for a plaintiff, "such as not being limited to freeholders" and it "became settled that the action could be used despite the simultaneous existence of another remedy."[24] Two points need to be observed, (1) damages were an available remedy in the nuisance action, and (2) a plaintiff had cumulative remedies in the form of a nuisance action and an action on the case for the same wrongful conduct.

¶14 Professor Oldham provides an example from the year 1610 where a defendant's conduct caused a nuisance wrong, but plaintiff brought the action on the case.[25] The Court of King's Bench noted that in a previous case it had been determined an action for damages could be recovered against a neighbor for stopping or preventing "wholesome air and light," and concluded a cause of action "lies in the case at bar for infecting and corrupting the air."[26]

¶15 The 1610 example was an action on the case or a type of negligence; but it was not until several decades later and still before our nation's independence that courts made greater efforts in classifying a defendant's conduct for the purpose of defining the scope of an action as on the case and negligence. A recent legal hornbook on torts has explained this concept with the following.

[N]egligence law developed from the action on the Case. The action on the Case was proper (a) when the defendant inflicted injury that was not immediate and direct, (b) when injury arose out of consented-to invasions that were carried out badly, as where a veterinarian undertakes to cure the plaintiff's horse and fails as a result of his negligence or neglect; and (c) when the defendant's fault lay in his failure to act rather than in some affirmative misconduct. In the action on the Case, the plaintiff was required to prove both the defendant's fault and actual harm. These instances all invoke the negligence action today.

Dan B. Dobbs, Paul T. Hayden, & Ellen M. Bublick, Hornbook on Torts 190-91 (West Academic, 2 ed., 2016). One of the cases these authors cite in support of this quotation is Reynolds v. Clarke (1726) 93 Eng. Rep. 747, 1 Strange 634,[27] and a famous distinction: "if you throw a log and strike the plaintiff, he has an action in Trespass, but if you leave a log in the road and the plaintiff falls over it in the dark, the plaintiff has an action on the Case."[28]

¶16 In theory, this same proverbial log in the road was not only a defendant's wrongful conduct supporting an action on the case and negligence, but the same log in the same road could also be used by the same plaintiff as showing wrongful conduct for a nuisance action.[29] The nature of the wrong did not control which form of action was used during this period, but plaintiff's selection of a forum controlled the selection of either nuisance or action on the case. This common-law nuisance theory reappeared on this side of the Atlantic in Lawton v. Olmstead, 40 A.D. 544, 58 N.Y.S. 36, 37 (App.Div.1899), where logs were piled on a public highway and the court explained they were a public nuisance: "[i]t seems clear that, as between the public and the defendant, it was his [defendant's] duty to remove that nuisance."[30] Further, I must also note that equity could be used to compel the defendant to remove this proverbial obstructing log as a nuisance, and the injured plaintiff could also obtain damages from injury caused by the log including any necessary cost for the log's removal in a nuisance proceeding long after the log had been removed from the road. The Court's observation herein that J & J's offending false representations and increased sale of opioids in Oklahoma are both in the past is not a fact, by itself, which frees J & J from legal liability for a public nuisance and damages created in Oklahoma.

¶17 A defendant's use of personal property, goods, or a chattel to block a roadway and the resultant cumulative remedies in both negligence and public nuisance is plainly found in the common law. An example of a legal hornbook on torts published in 1906, and four years prior to codification of nuisance in R.L. 1910, § 4250 (recodified as 50 O.S. § 1), is Francis M. Burdick's, The Law of Torts (Albany, N.Y., Banks & Co., 1906). Burdick notes the earliest and most frequent cases of public nuisances involved "obstructions to highways."[31] In 1928 Cardozo described a defendant's use of a chattel as an example for a nuisance-causing instrument with this type of public nuisance: "One can create a nuisance by leaving a wagon in the street."[32] The wagon used to block the public road in this example is, of course, chattel or personal property and not real property.[33] A defendant's wagon or vehicle blocking a public road may be located either adjacent to the defendant's real property, or making a delivery far from defendant's business, and in either instance create a public nuisance; because the conduct constituting the public nuisance results in an unreasonable interference with the public's right of travel,[34] and the public nuisance is not necessarily defined by the defendant's use of real property or the effect upon a plaintiff's real property right. Evidence of this last observation may be found in commentators of the common law who classified the power of the king to abate a nuisance obstructing the king's public way or highway as an exercise of the "king's power in ordering of commerce and trade,"[35] although a private person who had received "particular damage" also possessed an action against those who caused the nuisance.[36]

¶18 This concept states a defendant's wrongful conduct in a public nuisance action is also a type of wrongful conduct which may be found in traditional tort actions of intent, negligence, and strict liability, and such was noted in N.A.A.C.P. v. AcuSport, Inc., 271 F. SupP.2d 435 (E.D.N.Y. 2003), where the court relied on Dean William Prosser.

As a general term, "nuisance" "means no more than harm, injury, inconvenience, or annoyance." Copart Indus., Inc. v. Consol. Edison Co. of New York, 41 N.Y.2d 564, 567, 394 N.Y.S.2d 169, 362 N.E.2d 968 (1977) (citing Webster's Third New International Dictionary 571; American Heritage Dictionary 900) . . . The modern tort of public nuisance is "the invasion of an interest, a type of harm or damage, through any conduct which falls within the three traditional categories of liability"--intent, negligence, or strict liability. William L. Prosser, Private Action for Public Nuisance, 52 Va. L. Rev. 997, 1004 (1966).

Id., at 480-81. The idea of the "wrongfulness" of defendant's conduct described by Dean Prosser as "intent, negligence, or strict liability" appears in our nuisance statute, 50 O.S. 2011, § 1, when it requires a defendant to be "unlawfully doing an act, or omitting to perform a duty" as a causal basis for a nuisance. This statute states a nuisance requires a defendant to act in a manner which constitutes "unlawfully doing an act, or omitting to perform a duty."

A nuisance consists in unlawfully doing an act, or omitting to perform a duty, which act or omission either:
First. Annoys, injures or endangers the comfort, repose, health, or safety of others; or
Second. Offends decency; or
Third. Unlawfully interferes with, obstructs or tends to obstruct, or renders dangerous for passage, any lake or navigable river, stream, canal or basin, or any public park, square, street or highway; or
Fourth. In any way renders other persons insecure in life, or in the use of property, provided, this section shall not apply to preexisting agricultural activities.

50 O.S.2011, § 1. Additionally, the "either . . . or" language in the statute applies the language "unlawfully doing an act, or omitting to perform a duty" in a distributive manner to each of the statutory classifications of conduct labeled First, Second, Third, and Fourth in the statute.

¶19 An analysis of this element requires explaining the nature of "unlawfully doing an act or omitting to perform a duty." In a private nuisance context, this Court has defined this statutory wrongfulness as "a class of wrongs which arises from an unreasonable, unwarranted, or unlawful use by a person or entity of property lawfully possessed, but which works an obstruction or injury to the right of another." Briscoe v. Harper Oil Co., 1985 OK 43, 702 P.2d 33, 36. Although in a general sense an assessment of the reasonableness of a defendant's conduct may occur in a typical negligence case,[37] this "unreasonable, unwarranted, or unlawful use" as an element of nuisance is not equivalent to a negligence cause of action. Nuisance and negligence are two different causes of action: "Nuisance and negligence are distinct torts." Cities Serv. Oil Co. v. Merritt, 1958 OK 185, 332 P.2d 677, 684.

¶20 The concept of reasonableness occurs in the classification by courts of a nuisance per se and nuisance per accidens: (1) A nuisance per se is an act, occupation or structure which is a nuisance at all times and under any circumstances, regardless of location or surroundings; and (2) A nuisance per accidens, or nuisance in fact, "consists of those acts, occupations or structures which are not nuisances per se but may become nuisances by reason of the circumstances or the location and surroundings."[38] A defendant's conduct "must annoy, injure or endanger the comfort, repose, health, or safety of others, or possess some of the other qualities described in said [nuisance] statute."[39] Whether conduct of the defendant is reasonable often depends upon all the facts and circumstances of each particular case,[40] and we have expressly explained the presence of unreasonableness is determined as a question of fact based on the circumstances.[41]

¶21 Some courts have made a distinction between unreasonabless of the injury to plaintiff as opposed to unreasonableness of a defendant's conduct causing the injury. The Court's opinion today uses authority from Rhode Island, and Rhode Island is one of these courts. For example, in Wood v. Picillo, 443 A.2d 1244 (R.I. 1982), the court states: "liability in nuisance is predicated upon unreasonable injury rather than upon unreasonable conduct."[42] Wood then states: "Thus, plaintiffs may recover in nuisance despite the otherwise nontortious nature of the conduct which creates the injury."[43] Our statute, 50 O.S.2011, § 1, holds a defendant legally accountable in a nuisance action when the defendant's conduct is "unlawfully doing an act, or omitting to perform a duty." I view the language in Wood, and similar expressions from the Rhode Island courts, as necessarily limited in application in Oklahoma to what our Court has stated before: The tort of nuisance is a separate tort, and the tort is based upon a nuisance-type of unlawful or unreasonable conduct by a defendant and not whether a cause of action for negligence has been shown.

¶22 The Court relies upon Tioga Public School District No. 15 v. U.S. Gypsum Co., 984 F.2d 915 (8th Cir. 1993), applying North Dakota law, a similar statute, and concluding a nuisance action could not be used when a manufacturer sold and marketed an acoustical plaster for ceilings containing asbestos in the 1950s and 1960s and two schools sought damages after receiving notice in the 1980s concerning the dangers from this type of ceiling. The Eighth Circuit's nuisance analysis was: (1) The manufacturer was not in control of the product, i.e., the instrumentality causing the nuisance, because it was on the plaintiffs' ceilings, and this reasoning was further linked to an interference with a real property right as necessary for a nuisance; and (2) Under plaintiffs' theory in nuisance liability would be created for a defendant manufacturer "regardless of the defendant's degree of culpability or of the availability of other traditional tort law theories of recovery. Nuisance thus would become a monster that would devour in one gulp the entire law of tort...." Id. at 920-21. The Eighth Circuit did not discuss the fact that the nuisance statute, like 50 O.S.2011, § 1, requires wrongful conduct by a defendant, or that the real property nexus applicable in private nuisance law is not a necessary element in a public nuisance common-law cause of action, or the important role of public nuisance proceedings when the public health has been harmed by wrongful conduct of a defendant. The Eighth Circuit opinion is far from persuasive authority on these issues.[44]

¶23 A private nuisance should be distinguished from a public nuisance: "The distinction between private and public nuisances was another important feature of the law of nuisance that emerged before the eighteenth century."[45] The wrongful conduct constituting a public nuisance in the common law was an action instituted by indictment in the sixteenth century;[46] and a greater scope of conduct "emerged before the eighteenth century" when what had previously been remedied by a private nuisance action came to constitute a pubic nuisance action "when committed in a city or town."[47] Many nuisances became public nuisance regulated by statute and could include fines, such as the manufacturing, selling, or throwing fireworks.[48]

¶24 On this side of the Atlantic and more than a century ago, and two years prior to codification of 50 O.S. § 1 in its 1910 version, a New York court discussed the nature of fireworks as a common-law non-regulated public nuisance in Melker v. City of New York, 190 N.Y. 481, 83 N.E. 565 (1908). The conduct at issue was the defendant exploding fireworks on Madison Avenue, adjoining Madison Square, New York City, on the evening of election day, in November, 1902. The plaintiff sought damages for personal injury. Injury to the real property constituting Madison Avenue was not an issue in the controversy, and the explosion of fireworks was not specifically regulated by the municipality.[49] The court observed the nature of an injury constituting a "public nuisance" for the purpose of a penal code: "The injury may be to person or property, to health, comfort, safety, or morality."[50] Injury to real property was not required for the definition of public nuisance.[51] The court's reasoning included the observation that exploding a firework in the midst of a large city where a vast multitude of people is assembled could, as a matter of fact, inflict injury upon "person or property;" and if the manner of a defendant when exploding a firework is in its inherent nature so hazardous as to make the danger extreme and serious to either person or property, then whether the injury resulted from a public nuisance was a question for a jury in New York.[52] Discharging fireworks and causing a personal injury could be determined to be a common-law public nuisance by a jury, although such conduct, or act, was not expressly stated to be a public nuisance by regulation, code or statute in New York.

¶25 The explosion of the fireworks was a single event in time, and it could be used at a later time as part of the proof in a plaintiff's common-law public nuisance case seeking damages for personal injury.[53] The Court's focus on J & J no longer making false representations or selling opioids in Oklahoma and the absence of an injunction remedy does not show a freedom from common-law nuisance liability in a modern action. It is certainly true that continuing nuisances could be abated by the courts of England. However, the stated purpose of the injunction and damages remedy for a public nuisance action "was to avoid a multiplicity of actions" because a defendant "may find it worth his while to pay a fine and continue the nuisance in which case the publick has no redress."[54] Our Court appears to treat the remedy of injunction as a necessary element to state a common-law public nuisance cause of action. The purpose of an injunction in the common-law public nuisance action was to provide complete relief to the injured plaintiff and abatement should not be considered as a ground to deny a modern plaintiff an action for nuisance damages. There was no conduct to abate after the explosion of the firework in Melker, but damage from that explosion had occurred and the alleged wrongful conduct did not lose its nuisance attribute by the absence of plaintiff's need for the remedy of injunction.

¶26 The Court's analysis indicates harm from a manufacturer's misrepresentations concerning the safety of a commercial product is remedied by a type of products liability action, and not a public nuisance action brought by the Oklahoma Attorney General. I would be surprised for several reasons if the Court means a remedy by a strict products liability action always negates a public nuisance common-law action.

¶27 One is the reasoning expressed in the authority cited by the Court. The Court quotes the Restatement (Third) of Torts § 8 (Opin. at ¶ 21) and in that quotation the reasoning for denying a public nuisance action and requiring a plaintiff to use a products liability action is: "Mass harms caused by dangerous products are better addressed through the law of products liability, which has been developed and refined with sensitivity to the various policies at stake." The products liability action which has been "developed and refined with sensitivity" as a replacement cause of action for public nuisance in this quote necessarily relies on the plaintiff actually having an opportunity to use the products liability remedy for the particular harm suffered. The Court nowhere states the Oklahoma Attorney General has possessed a cause of action to remedy the damage to the public purse caused by J & J facilitating a public health opioid addiction crisis.

¶28 Additionally, this quote does not deny that public nuisance is a common law remedy for a mass harm, only that the nuisance cause of action is "an inapt vehicle." The Restatement quote is a public policy argument. There is a difference between (1) a large number of private parties seeking remedies for their individual private harms and (2) a single State Attorney General seeking damages to remedy a single harm to the public purse caused by each manufacturer's wrongful conduct and individual harm.

¶29 Further, the Court does not address the concept of cumulative remedies in the common law, and when a defendant's wrongful conduct could, or could not, serve as proof in cumulative tort common-law remedies. When the Court focuses on the allegation of wrongful tort conduct as requiring a particular common-law tort remedy of products liability in the absence of a legislative requirement, it appears to make the "form of action" a necessary element for a "cause of action."[55] When it takes away a plaintiff's choice to select a cumulative common-law remedy because of the nature of plaintiff's allegation of wrongful conduct, the result is a legal anachronism where plaintiff's selection of a remedy was limited by the nature of plaintiff's allegation of injury. For example, the procedure used in cases five-hundred years ago when a particular process was used to bring a defendant into court and the defendant could plead the particular process would not support a judgment because the process was limited to one type of wrongful conduct and not another, such as when an action in nuisance was not included by the process used and judgment was granted to a defendant.[56]

¶30 The Court relies on common-law sources and mistakenly concludes a plaintiff must use the common-law tort remedy of products liability, and not use the common-law tort remedy of public nuisance based upon alleged harm from the manufacture and sale of a product using false and misleading representations.

III. Public Health and Public Nuisance

¶31 The Court does not address the importance of a public nuisance proceeding to public health. Nuisance is a proceeding in equity, and equity looks beyond the form of the transaction and to the substance of the legal issues. Stated another way: an adjudication in equity values substance over form.[57] In this case, the substance of equity assigning proper legal liability for a public health crisis, and not the form of a products liability action and remedy.

¶32 One author has stated: "As a matter of substantive law, a private nuisance, as distinct from a public one, is an unreasonable interference with one's use and enjoyment of land."[58] At one time the name of "nuisance" applied to an action possessed by an individual for injury to his or her land, a "private nuisance," and "nuisance" came to be applied to an action to prevent injury to public rights; but the label of "public nuisance" to such injury is simply misleading, as Prosser, Keeton, and others have explained.

Despite a shared surname, private and public nuisances have little in common. A private nuisance is "a civil wrong, based on a disturbance of rights in land," while a public nuisance is "a species of catch-all criminal offense, consisting of an interference with the rights of the community at large." Indeed, "it would have been fortunate if they had been called from the beginning by different names." Unfortunately, the distinction between the two doctrines is frequently overlooked in the case law, contributing to much of the confusion surrounding the law of nuisance.

Bradford A. Wyche, A Guide to the Common Law of Nuisance in South Carolina, 45 S.C. L. Rev. 337, 341 (1993) (quoting W. Page Keeton, et al., Prosser and Keeton on the Law of Torts § 86, at 618 (5 ed. 1984)). This Court relied on Wyche's article in the context of a private nuisance controversy in Nichols v. Mid-Continent Pipe Line Co., 1996 OK 118, n.7, 933 P.2d 272, 276. Wyche states a private nuisance is applied to a damaged interest in real property, but a public nuisance does not require a real property nexus to the nuisance. Historically, a public nuisance occurred when a defendant's conduct "involved some interference with the interests of the community at large--interests that were recognized as rights of the general public entitled to protection." Restatement (Second) of Torts § 821B cmt. b (1979) (Common law public nuisances).

¶33 Similarly, Wyche explained: "'A public nuisance exists wherever acts or conditions are subversive of public order, decency, or morals, or constitute an obstruction of public rights.'"[59] The author also noted that in the State of South Carolina a State executive agency had authority to prevent or abate nuisances affecting public health, as well as authority to issue orders and rules for the purpose of suppressing nuisances dangerous to the public health.[60] Similarly, our 50 O.S.2011, § 1 references "unlawfully doing an act" when the act "[a]nnoys, injures or endangers the comfort, repose, health, or safety of others." (Emphasis added.)

¶34 A State or municipality's use of a public nuisance proceeding for the benefit of public health interests is nothing new. The language of the police power and the common law of nuisance appear in the maxim sic utere tuo ut alienum non laedas (use your own so as not to injure another); and several legal historians have explained that sic utere tuo combined with a public nuisance power was a substantive reference point for regulation of public health more than a century ago.

[N]uisance law was one of the most important regulatory tools of the nineteenth-century American state. Ernst Freund dubbed nuisance law 'the common law of the police power, striking at all gross violations of health, safety, order, and morals.' Horace Wood captured something of the power of sic utere tuo and the reach of the common law vision of a well-regulated society in his 1875 treatise on the Law of Nuisances:

No man is at liberty to use his own without any reference to the health, comfort or reasonable enjoyment of like public or private rights of others. Every man gives up something of this absolute right of dominion and use of his own, to be regulated or restrained by law, so that others may not be hurt or hindered in the use or enjoyment of their property. This is the fundamental principal of all regulated civil communities, and without it society could hardly exist, except by the law of the strongest.

For these thinkers, sic utere tuo constrained individual behavior, but it did not limit or detract from individual liberty.

William J. Novak, The People's Welfare: Law and Regulation in Nineteenth-Century America 44-5 (Chapel Hill: The University of North Carolina Press, 1996) (quoting Ernst Freund, Standards of American Legislation 66 (Chicago, Univ. of Chicago Press, 2 ed. 1965), and Horace G. Wood, A Practical Treatise on the Law of Nuisances 21 (Albany, N.Y., 2nd ed., 1883). Novak also noted "The common law of nuisance and the law of overruling necessity, legal embodiments of sic utere tuo and salus populi [salus populi suprema lex est, welfare of the people is the supreme law][61] figured prominently in cases involving dangers to the people's safety." Novak, supra, at 53.

¶35 One type of case which figured prominently was the threat to public health, specifically the threat to public heath by epidemic, which "galvanized an entire movement for medical police and public health reform."[62] Of course, many health regulation schemes authorized health officials to invoke judicial power when necessary to prevent "health nuisances," by removing or destroying sources of filth and sickness, which included personal property such as cargo in transit and the vessel containing such cargo when the vessel was also a public nuisance;[63] and early examples of such regulations are found in Philadelphia in 1794 and 1799, as well as in Boston by 1816.[64] In New York, a regulatory scheme to prevent the spread of epidemic by quarantining a person, the person's personal property, and a vessel containing both affected persons and property, were combined with regulatory creation of locations for placement of the persons and their property; and these regulations were enforced using a court's equity jurisdiction to both accomplish the purpose of these public nuisance provisions as well as keep the actions of the officials within the scope of their authority.[65]

¶36 These health regulations came to be viewed as not first or primarily concerned with operating on real property itself. Health regulations and restraining orders were to act first and foremost on people infected, or suspected to be infected, with a communicable disease and stop their physical movement in public society. The regulations and court orders could, and often did, direct them to stay at a specific location such as a home, or a place provided such as in Seguine v. Schultz, supra, or by providing another solution such as our former tubercular sanitarium at Talihina, Oklahoma, which provided residential treatment.

¶37 In other words, heath regulations and the law of public nuisance were not first concerned with real property where the proverbial Typhoid Mary was located, but with stopping her movement in society from place to place by using either a regulatory or equitable type of restraint on her person and movement.[66] Discussion of public health and the scope of a court's authority in a public nuisance action is particularly appropriate in the context of the Court's present opinion. The State's cause of action in today's case includes the concept that opioid addiction is a type of disease,[67] and a public health addiction crisis from this disease was facilitated in its creation and continuance by deceptive marketing by defendants.

IV. Responsibility and the Opioid Addiction Crisis

¶38 In our society, people are held legally accountable for certain consequences of their personal decisions, and we expect them to possess a general knowledge of opioids when their personal decisions involve the use of opioids. Common English dictionaries may be used by courts as one possible source when determining common knowledge within the reach of everyone. This includes a common understanding of such terms as "narcotic," "opium," "heroin," and "morphine" when they appear in these dictionaries. For example, in 1918 the U.S. Eighth Circuit Court of Appeals explained evidence that morphine, heroin, and cocaine are derivatives of opium and coca leaves was unnecessary because the meaning of the words were long in common use, there was no obscurity, controversy, or dispute in meaning, and the "imperfectly informed can gain complete knowledge by resort to dictionaries within reach of everybody." Further, commonly found dictionaries published more than twenty years ago include descriptions of commonly recognized effects caused by narcotics, including a common recognition that various effects may result from various dosages. For example, a narcotic "reduces pain, alters mood and behavior, and usually induces sleep or stupor," and a narcotic "in moderate doses dulls the senses, relieves pain, and induces profound sleep but in excessive doses causes stupor, coma, or convulsions." Society expects the public to know these things.

¶39 Society, including courts, also has certain expectations concerning drug manufacturers and physicians speaking the truth to patients. An alleged failure to perform a "duty" often appears in opioid-related public nuisance litigation in two general types of alleged conduct by defendants. The first is an allegation of false and misleading advertising causing overprescribing by physicians. The allegation of false and misleading information is often divided into: (1) false and misleading information contrary to or inconsistent with the manufacturer's product information/package insert of warnings for a specific opioid, (2) misleading information which is not directly contradicted in a manufacturer's product information/package insert due to an absence of a specific contrary fact in the package insert, and (3) scientific insufficiency of the manufacturer's package insert, including warnings; and sometimes an allegation of an insufficient insert or public warnings influenced by an alleged temporary regulatory capture[68] of Food and Drug Administration (FDA) employees.

¶40 This case is about J&J promoting the purchase and use of its drugs through increased prescriptions by physicians. When members of the public use physician-prescribed drugs they rely on the professional knowledge of the physician, and a physician relies on professional knowledge communicated from drug manufacturers and the FDA. J & J and its associated entities are responsible for false and deceptive marketing in Oklahoma or directed to the citizens of Oklahoma when the marketing related to the safety of their opioids sold in Oklahoma. The District Court was required to adjudicate the public nuisance liability based upon the wrongful conduct of J & J and associated entities, and not any other defendant.

¶41 Prescribed drugs may be extremely effective and used safely. The issue is not whether J&J's opioid products may be prescribed in a safe manner and may be medically beneficial, but whether the deception by J & J caused its opioid products to be prescribed in an unsafe manner which resulted in, or contributed to, a public nuisance in this State. Members of the public are not drug scientists, and they rely on drug manufacturers, the FDA, and their physicians to tell them when a prescribed drug is safe or unsafe to be applied, swallowed, or injected; and this is one reason they receive directions from health professionals when using drugs prescribed by their physicians.

¶ 42 Surely a public nuisance action may be based upon the actions of a defendant marketing and selling a good which is unlawful. State ex rel. Field v. Hess, 1975 OK 123, 540 P.2d 1165. In that controversy, specific material was found to violate an obscenity statute and an injunction issued to prevent the marketing and sale of the material: "Affirmed with permanent injunction modified to enjoin the sale, distribution, exhibiting, bartering or trafficking in particular and individual works or publications used as exhibits in the trial court." Id. at 1171. But the Court in Hess did not limit a public nuisance action to marketing and selling products which are illegal.[69]

¶43 The Court reaches several conclusions to ultimately conclude that here no cause of action for public nuisance exists. Our statute 50 O.S.2011, § 1 requires wrongful conduct on the part of the defendant in the nuisance action: "A nuisance consists in unlawfully doing an act, or omitting to perform a duty." This statute is a limiting principle for imposing legal liability on J & J and its associated entities in a public nuisance cause of action. The public nuisance cause of actions exists in the common law and in 50 O.S.2011, § 1. The trial court made findings of fact relating to J & J's wrongful conduct.

¶44 J & J is apparently no longer marketing its product in Oklahoma with associated deceptive practices. This wrongful conduct on its part has stopped. The harm suffered by the State and its citizens lingers and no injunctive relief is available. But an abatement of a nuisance does not prejudice a right to recover damages for its past existence.[70] The equitable result in this case is not the Court's action in reversing the judgment with a conclusion no cause of action exists because the Attorney General sought a different common-law remedy from the one the Court states is available for mass torts. The action in the trial court was based upon J & J's deception in marketing prescribed drugs in Oklahoma. I would remand to the District Court to recalculate damages based upon J & J's share of the market in the years it sold its opioids in Oklahoma with its deceptive marketing scheme. The Attorney General's basic theory of the case is tenable, both in law and equity. The Court's view of public nuisance is too narrow and does not serve an important public policy when there is an opposing important public policy in support of a District Court adjudicating legal liability based upon defendants' wrongful conduct by participating in a public nuisance common-law tort. I respectfully dissent.

FOOTNOTES

[1] Final Judgment After Non-jury Trial, Nov. 15, 2019, Finding of Fact No. 18.

[2] Id. Judgment, Finding of Fact No. 52.

[3] See also Henry L. McClintock, Handbook on the Principles of Equity, 380-81 (St. Paul: West Publishing, 1948) (citing Chipman, supra, Warren v. Parkhurst, 45 Misc. 466, 92 N.Y.S. 725, 725-28 (Sup.Ct.1904), aff'd, 105 App. Div. 239, 93 N.Y.S. 1009 (3rd Dept.1905), aff'd, 186 N.Y. 45, 78 N.E. 579 (1906) (stated a remedy at law for damages in nuisance was recovered against defendants individually and relied on Chipman, and further stated: "a reference may be had to determine what damage has been caused by each defendant . . . This power of a court of equity to grant exact justice and proper relief for or against each defendant relieves such an action of any possible hardship.")).

[4] Thomas v. E-Z Mart Stores, Inc., 2004 OK 82, ¶ 21,102 P.3d 133, 139 (discussion of classifying tortfeasors).

[5] Compare Smicklas v. Spitz, 1992 OK 145, 846 P.2d 362, 367 (When both injunctive relief and damages are sought, the existence of a nuisance and its resulting damages are questions of fact for the jury.); and Goodall v. City of Clinton, 1945 OK 235, 161 P.2d 1011, 1013-14 ("a suit to abate a nuisance, such as the defendants' cross-petition, is not, as argued by plaintiffs, triable to a jury as a matter of right") (citing Gragg v. State, 1918 OK 416, 175 P. 201).

[6] See, e.g., Smith v. Johnston, 1978 OK 142, 591 P.2d 1260 (plaintiff waived a contract action and sued in tort, and after the jury returned a verdict for actual and exemplary damages, an order of remittitur was accepted and affirmed on appeal).

[7] Final Judgment After Non-jury Trial, Nov. 15, 2019, Finding of Fact No. 21.

[8] Id.

[9] Id. Judgment, Finding of Fact No. 4.

[10] Id. Judgment, Finding of Fact No. 6.

[11] The issue of a remedy made mandatory by statute is not before the Court and need not be discussed. For examples of mandatory or exclusive remedies, see Assessments for Tax Year 2012 of Certain Properties Owned by Throneberry v. Wright, 2021 OK 7, ¶¶ 30-31, 481 P.3d 883, 897 (tax claims), and Farley v. City of Claremore, 2020 OK 30, ¶ 26, 465 P.3d 1213, 1228 (workers' compensation).

[12] State ex rel. Okla. Bar Ass'n v. Mothershed, 2011 OK 84, ¶ 82, 264 P.3d 1197, 1228 (Forms of action have long been abolished in this State, and Okla. Const. Art. 2, § 6 indicates that judicially cognizable wrongs are not defined by particular remedies) (citing Ethics Comm'n v. Cullison, 1993 OK 37, 850 P.2d 1069, 1073 ("Since 1893 this jurisdiction has recognized that forms of action are abolished," and the Court's analysis includes this attribute of Okla. Const. Art. 2 § 6)).

Okla. Const. Art. 2, § 6: "The courts of justice of the State shall be open to every person, and speedy and certain remedy afforded for every wrong and for every injury to person, property, or reputation; and right and justice shall be administered without sale, denial, delay, or prejudice."

[13] Nichols v. Mid-Continent Pipe Line Co., 1996 OK 118, 933 P.2d 272, 276. See also Horace G. Wood, A Practical Treatise on the Law of Nuisances in their Various Forms 26 (Albany N.Y., 1875) ("[A] public nuisance is a violation of a public right, either by direct encroachment upon public rights or property, or by doing some act which tends to a common injury, or by omitting to do some act which the common good requires, and which it is the duty of a person to do, and the omission to do which results injuriously to the public."); see also Joseph A. Joyce & Howard C. Joyce, Treatise on the Law Governing Nuisances § 5 (Albany, N.Y. Matthew Bender, 1906) (a public nuisance "is an offense against the public order and economy of the State, by unlawfully doing any act or by omitting to perform any duty which he common good, public decency or morals, or the public right to life, health, and the use of property requires, and which at the same time annoys, injures, endangers, renders insecure, interferes with, or obstructs the rights or property of the whole community, or neighborhood, or any considerable number of persons.").

[14] Watson v. Gibson Capital, L.L.C., 2008 OK 56, ¶12, 187 P.3d 735.

[15] Taylor v. State Farm Fire & Cas. Co., 1999 OK 44, ¶ 21, 981 P.2d 1253, 1261--62 ("Legislative abrogation of the common law may not be effected by mere implication. It must be clearly and plainly expressed.") (notes omitted).

[16] 12 O.S.2011 § 2: "The common law, as modified by constitutional and statutory law, judicial decisions and the condition and wants of the people, shall remain in force in aid of the general statutes of Oklahoma; but the rule of the common law, that statutes in derogation thereof, shall be strictly construed, shall not be applicable to any general statute of Oklahoma; but all such statutes shall be liberally construed to promote their object."

[17] Oklahoma City v. West, 1931 OK 693, 7 P.2d 888, 891, 893 ("The damages are recoverable for what was, and what still is, a common-law tort, a nuisance;" and again, "[b]ut the right to damages in this case is not the right to damages for what has been legalized, but the right to recover damages for a common-law tort, a nuisance, and a nuisance not authorized for the plain reason that it is in no sense necessary."). The classification of a nuisance as a common-law tort was part of the Court's analysis, and appears in the Court's Syllabus explaining a temporary nuisance caused by improper public sanitation procedure could be remedied by "damages recoverable for a common-law tort." Id. 7 P.2d at 889 (Syllabus by the Court); cf. Big Four Foundry Co. v. Hagens, 1946 OK 201, 172 P.2d 322, 323 (Syllabus by the Court) (A jury verdict (1) denied plaintiff's action for damages to real property, but (2) awarded plaintiff $250.00 on her action for personal annoyance and inconvenience when "[t]he court submitted the issues in the case at bar on the theory that a nuisance was created or perpetrated and that the plaintiff could recover all damages accruing within two years next preceding the filing of the petition;" and the Court affirmed the judgment on the verdict because the action was not barred by the limitations period in 12 O.S.1941 § 95 subd. 3, for an "action for injury to the rights of another, not arising on contract" since defendant's "operation continues to be negligent and a nuisance and the damages are shown to have occurred within two years prior to the filing of the petition.").

[18] Bowles v. Neely, 1911 OK 122, 115 P. 344 ("A 'cumulative remedy' is a remedy created by statute in addition to one which still remains in force; and, when a statute gives a new remedy, and contains no negative, express or implied, of the old remedy, the new one provided is cumulative, and the party may elect between the two.") (Syllabus by the Court).

[19] The phrase sub silentio in this context refers to: "A question which merely lurks in the record, never brought to the attention of the Court, nor ruled upon, [and] is not to be considered as having been so decided as to constitute precedent." Bowles v. City of Enid, 1952 OK 215, 245 P.2d 730, 733; see also Homesteaders v. McCombs, 1909 OK 202, 103 P. 691, 694 (issue present in a case but not discussed as part of the Court's holding).

[20] We have explained legislative silence and acquiescence to this Courts construction of legislative intent. I.T.K. v. Mounds Pub. Schs., 2019 OK 59, n. 43, 451 P.3d 125. When this Court is silent on an issue in an opinion the subsequent legislative silence on the same issue is no expression of legislative agreement.

[21] Copart Indus., Inc. v. Consol. Edison Co. of New York, 41 N.Y.2d 564, 394 N.Y.S.2d 169, 362 N.E.2d 968, 970-71 (1977).

[22] James Oldham, English Common Law in the Age of Mansfield 249 (2004).

[23] Id.

[24] Id. (citing J. H. Baker, An Introduction to English Legal History, 423-426 (London: Butterworths, 4 ed., 2001)).

[25] Id. at 249-50 (citing C.H.S. Fifoot, History and Sources of the Common Law: Tort and Contract, 99 (London: Stevens, 1949) and discussing Aldred's Case, (1610) 77 Eng. Rep. 816, 9 C. Rep. 57b.

[26] Id. at 250 (citing C.H.S. Fifoot, History and Sources of the Common Law 101, and comments by Sir Christopher Wray, Chief Justice, discussed in Aldred's Case).

[27] See Reynolds v. Clerk (1725) 88 E.R. 193, 196, 8 Modern 272 (per Fortescue, J.) (If logs are laid in the highway by which any person is hurt an action on the case is proper, but if the hurt is received by logs thrown at the person then a trespass vi et armis is proper). In Beard v. Viene, 1992 OK 28, n. 36, 826 P.2d 990, 997, we observed: "From its earliest beginnings, one of the primary objectives of the common law has been to redress civil wrongs," and we noted as a part of this history Reynolds v. Clarke (1724) 92 Eng.Rep. 410, 413, 2 Ld. Raym. 1399 (second argument Trinity term 1725) (principle using immediacy of harm causing a trespass versus placement of a log of wood in the highway and a consequential injury as part of action on the case). The concept was later discussed in Scott v. Shepherd (1773) 95 E.R. 1124, 1129, 3 Wils. 403, (per de Grey, C.J.) (unlawful act of laying a log in highway is a nuisance, and if injury be immediate and direct it is trespass vi et armis, and if consequential then trespass on the case).

[28] Dobbs, Hayden, & Bublick, Hornbook on Torts 190 n. 24.

[29] The result from holdings by the Court of Kings Bench "gave the plaintiff an election between case and the assize [of nuisance]." John Baker, An Introduction to English Legal History, 454 (Oxford: Oxford Univ. Press, 5 ed., 2019). Common Pleas "did concede that special loss would justify an action on the case," and the issue of overlapping remedies involving nuisance and the practice of the Exchequer Chamber reversing King's Bench judgments was effectively resolved when it was decided "with only two judicial grumbles--that case would lie for enclosing a common." Id.

[30] Lawton, 40 A.D. at 546, 58 N.Y.S. at 37.

[31] Burdick, supra at 408.

[32] McFarlane v. City of Niagara Falls, 247 N.Y. 340, 160 N.E. 391, 392 (1928) (citing Cohen v. City of New York, 113 N.Y. 532, 21 N.E. 700, 4 L.R.A. 406, 10 Am. St. Rep. 506 (1889)).

[33] Kirby v. Jean's Plumbing Heat & Air, 2009 OK 65, ¶ 14, 222 P.3d 21, 27 ("Chattel" is defined as "movable property.").

[34] Of course, the right to travel on a public roadway freely and without impediment at all times was not absolute in the common law, and the temporary delivery of passengers, merchandise, or other supplies at businesses and homes on a street was considered to be a necessary incident to the use of a public highway. See, e.g., City of Chicago v. McKinley, 344 Ill. 297, 176 N.E. 261 (1931) (the primary use of a public highway is for the unobstructed and uninterrupted use of the public; but a temporary obstruction for delivery purposes is not a public nuisance, and an ordinance specifying a time not to exceed three minutes for unloading passengers and thirty minutes for freight is not unreasonable).

[35] Hale, Matthew, The Prerogatives of the King 286-321 (D.E.C. Yale ed.) (London, Selden Society 1976) (Ch. XXI, The King's Power in Ordering Commerce and Trade) (composite text from various texts by Hale during his life, 1609-1676, with Chapter XXI derived from his Preparatory Notes touching the Rights of the Crown, (or The Rights of the Crown) and in part as transcribed by Francis Hargrave, 1809-1813).

[36] Id. at 310-13.

[37] See, e.g., Colbert v. World Pub'g Co., 1987 OK 116, 747 P.2d 286, 290 (quoting U.S. in Time, Inc. v. Hill, 385 U.S. 374, 389--90, 87 S.Ct. 534, 542--43, 17 L.Ed.2d 456, 467--68 (1967) for the general observation that when a court uses a negligence test, then such would typically involve a jury assessing the reasonableness of a defendant's conduct).

[38] McPherson v. First Presbyterian Church, 1926 OK 214, 248 P. 561, 564, 51 A.L.R. 1215 (quoting a legal encyclopedia).

[39] Id. at 564-65.

[40] Id. at 565.

[41] Smilie v. Taft Stadium Bd. of Control, 1949 OK 42, 205 P.2d 301, 306-07 (where the reported case contains no discussion of modern decibel level public health regulations; the Court states circumstances of the case necessarily influence the decision whether a private nuisance is present based on noise caused by defendant, nuisance is based upon noise which is unreasonable in degree, "and reasonableness in this respect is a question of fact").

[42] Wood, 443 A.2d at 1247 (citing Braun v. Iannotti, 54 R.I. 469, 471, 175 A. 656, 657 (1934)).

[43] Wood, 443 A.2d at 1247.

[44] See supra note 19 and the effect of a sub silentio issue in a court opinion.

[45] Oldham, supra note 22, at 250 (emphasis added).

[46] Id. at 250 & n. 8 ("public" and common" were used synonymously when discussing a public nuisance) (citing W. S. Holdsworth, 2 A History of English Law 424(reprint, London: Methuen, Sweet and Maxwell, 1966) (by the beginning of the sixteenth century a judicially cognizable nuisance could be public or private); C. Viner, A General Abridgement of Law and Equity, (London: G.G.J. and J. Robinson, 1793), 16:20 ("Publick is that which is to the nuisance of the whole realm. Common is that which is to the common nuisance of all passing by.")).

[47] Id. at 250 & n. 9 (citing Baker, English Legal History, 4 ed., 433).

[48] Id. at 250 & n. 10 (citing the English statute, 1697, 9 Will. 3, c. 7).

[49] The court concluded its opinion noting that in a circumstance involving discharge of fireworks a "terrible but unprecedented result may suggest regulation or restraint by the Legislature." Melker, 190 N.Y. at 491, 83 N.E. at 568. Some municipalities other than New York regulated fireworks by exercising discretion on the issue whether a nuisance existed. See, e.g., McDade v. City of Chester, 117 Pa. 414, 12 A. 421 (1888) (judgment for defendant in an action on the case against a municipality for plaintiff's personal injury from the explosion of a fireworks manufactory because municipality had discretion whether to stop the manufactory as a public nuisance).

[50] Melker, 190 N.Y. at 488, 83 N.E. at 567 (emphasis added).

[51] Public nuisance liability includes the equitable concept that a defendant should refrain from injuring persons as well as property: "But the principle [in equity] of abstaining to hurt others regards persons as well as property." Principles of Equity: Henry Home, Lord Kames 43 (Michael Lobban, ed.) (Indianapolis, Liberty, 3 ed. 2014) (principle discussed in the context of explaining that while neighbors must submit to mere inconveniences caused by each other, they must be protected from "extraordinary disturbances.") (emphasis added).

[52] Id. at 490-91, 83 N.E. at 567.

[53] See, e.g., Oldham, supra note 22 at 251 & n. 16 ("[Chief Justice] Holt established that a single offense could constitute a nuisance, whether public or private." (citing Tenant v. Goldwin, (1704) 92 Eng. Rep. 222, 2 Raym. Ld. 1089, 3 Raym. Ld. 324.)).

[54] Oldham, supra note 22 at 252 n. 23 (quoting Rex v. Papineau, (1726) 2 Stra. 686, 687, and citing 3 William Blackstone, Commentaries, *217-18).

[55] Ethics Com'n of State of Okla. v. Cullison, 1993 OK 37, 850 P.2d 1069, 1073 (remedies in this State are not defined by a common-law form of action).

[56] See, e.g., The Notebook of Sir John Port 64-66 (J.H. Baker ed., London, Selden Society, 1986) (reporting Rex v. Betyn, record at K.B. 27/1073, Mich. (1529) (KB) (Eng.), no judgment where indictment process of outlawry was based upon allegations of a nuisance, prostitution, and common scold; and the court concluded "process of outlawry does not lie in nuisance" and in addition to other insufficiencies such as a failure to state with whom the defendant committed an offense and the day and place).

[57] Mustang Run Wind Project, LLC v. Osage Cty. Bd. of Adjustment, 2016 OK 113, ¶ 23, 387 P.3d 333, 343.

[58] Dan B. Dobbs, Handbook on the Law of Remedies: Damages--Equity--Restitution 332 (St. Paul: West Publishing 1973) (emphasis added).

[59] Wyche, supra at 341 (quoting State v. Turner, 198 S.C. 487, 495, 18 S.E.2d 372, 375 (1942)).

[60] Id. at 342.

[61] This Court's ceremonial courtroom has two statements emblazoned on two opposite walls: (1) "The safety of the State is the highest law. Justinian;" and (2) "The foundations of justice are that no man shall suffer wrong. Cicero." These two principles relate to the role of courts in protecting the welfare of the people both individually and collectively.

[62] Novak, supra, at 53; see also Restatement (Second) of Torts § 821B cmt. g (1979) ("the threat of communication of smallpox to a single person may be enough to constitute a public nuisance because of the possibility of an epidemic").

[63] See, e.g., Lewis v. Dodge, 17 How. Pr. 229, 232, 237 (N.Y. Gen. Term 1858) (A party alleged a partially burned and sunken vessel in a municipal harbor was a public nuisance and dangerous to the public health caused by the decomposition of the vegetable substances in its cargo; and the court stated the municipality had "an undoubted right to declare such vessel a nuisance and to order it to be removed" and this power to remove the personal property "carries with it the right to retain the removed property, until compensation for the expense of such removal can be made.").

[64] Novak, supra, at 201-04.

[65] See, e.g., Seguine v. Schultz, 31 How. Pr. 398, 409-410 (N.Y. Gen. Term 1866) (Injunction issued to keep officials within the scope of their authority and the court explained the scope of the authority: Quarantine establishments were authorized for the purpose quarantining people, their property, and vessels containing such people and their property, and the establishments included: (1) warehouses, wet docks and wharves at a specific location, (2) anchorage for vessels at a specific location a specified distance from shore, (3) a floating hospital, (4) a "boarding station" comprising a floating hospital and vessels anchored nearby, (5) a designated burying ground on State land, (6) residences for officers, and (7) the appropriation of vessels for the service of ill persons).

[66] Reisner v. Regents of Univ. of Cal., 31 Cal. App. 4th 1195, 37 Cal. Rptr. 2d 518, 524 n.6 (1995), ("In the early 1900's, Mary Mallon, an Irish cook working in the United States, was a typhoid carrier who, herself immune to the typhoid bacilli, unwittingly infected virtually everyone with whom she came in contact (51 original cases were directly attributed to her.") (citing Webster's Third New International Dictionary 2476 (1981); 12 New Encyclopaedia Britannica 88 (15 ed. 1988); Wright v. Schum, 105 Nev. 611, 89 A.L.R. 4 359, 781 P.2d 1142, 1143 (1989), (Typhoid Mary "was outcast from one place only to continue her deadly disease-spreading activity at another place")).

[67] See, e.g., State ex rel. Okla. Bar Ass'n v. Beasley, 2006 OK 49, ¶ 43, 142 P.3d 410, 418-19 (discussing substance abuse and drug addiction, and a lawyer recognizing the adverse affect a debilitating disease or illness has on the discharge of that lawyer's professional responsibilities) (citing State ex rel. Okla. Bar Ass'n v. Giger, 2001 OK 96, 37 P.3d 856); Koon v. Walden, 539 S.W.3d 752, 756 (Mo. Ct. App. 2017) (Court discussing the evidence at trial: "All patients who use opioids for long enough will become tolerant and dependent, and some will become addicted. Addiction is a disease characterized by habituation, craving and preoccupation with obtaining and taking the drug.").

[68] Regulatory capture is a well-known phrase describing a revolving door of agency employees who are involved with agency regulation of businesses, and then discontinue their government employment to become employed by the regulated businesses in matters related to the regulation; and an issue often arises whether the businesses received regulatory leniency prior to the employees change in employment status. Cf. Ajunwa, Ifeoma, An Auditing Imperative for Automated Hiring Systems, 34 Harv. J.L. & Tech. 621, 669-70 (2021) ("Examples of regulatory capture abound in American government, including that of the U.S. Securities and Exchange Commission ('SEC'), the Food and Drug Administration ('FDA'), and most importantly the EEOC.").

[69] The public sale of "noxious and unwholesome food" due to adulteration or disease was considered to be a public nuisance, an injury to a public right, "causing injury to the health of those consuming it," and the proper subject of regulation in the common law. See, e.g., Wood, supra, note 13, at § 71. Similarly, a manufacturer's public sale became a public injury not from the mere sale of an opioid, but a sale combined with false information specifically directing an unsafe manner to consume the opioid which resulted in public injury.

[70] 50 O.S.2011 § 6: "The abatement of a nuisance does not prejudice the right of any person to recover damages for its past existence."






 Citationizer© Summary of Documents Citing This Document
 
 
 
 Cite
 Name
 Level
 
 
 
 None Found.
 
 
 Citationizer: Table of Authority
 
 
 
 Cite
 Name
 Level
 
 
 
 Oklahoma Court of Criminal Appeals Cases
 Cite
Name
Level

 1955 OK CR 100, 289 P.2d 396, GORDON v. STATE
Discussed
 1981 OK CR 101, 633 P.2d 1256, SWANSON v. CITY OF TULSA
Discussed
Oklahoma Supreme Court Cases
 Cite
Name
Level

 1987 OK 116, 747 P.2d 286, 58 OBJ 3303, Colbert v. World Pub. Co.
Discussed
 1991 OK 41, 810 P.2d 1270, 62 OBJ 1299, Sharp v. 251st Street Landfill, Inc.
Discussed
 1992 OK 28, 826 P.2d 990, 63 OBJ 605, Beard v. Viene
Discussed
 1992 OK 145, 846 P.2d 362, 63 OBJ 3023, Smicklas v. Spitz
Discussed
 1993 OK 37, 850 P.2d 1069, 64 OBJ 978, Ethics Com'n of State of Okl. v. Cullison
Discussed at Length
 1993 OK 60, 852 P.2d 150, 64 OBJ 1421, Special Indem. Fund v. Bedford
Discussed
 1952 OK 70, 241 P.2d 959, 206 Okla 145, STATE EX REL. v. ARMSTRONG
Discussed
 1952 OK 215, 245 P.2d 730, 206 Okla 611, BOWLES v. CITY OF ENID
Discussed
 1946 OK 201, 172 P.2d 322, 197 Okla. 409, BIG FOUR FOUNDRY CO. v. HAGENS
Discussed
 1955 OK 195, 287 P.2d 909, UPDEGRAFF v. CITY OF NORMAN
Discussed
 1945 OK 235, 161 P.2d 1011, 196 Okla. 10, GOODALL v. CITY OF CLINTON
Discussed at Length
 2001 OK 96, 37 P.3d 856, 72 OBJ 3401, STATE ex. rel. OKLAHOMA BAR ASSOCIATION v. GIGER
Discussed
 1918 OK 416, 175 P. 201, 73 Okla. 132, GRAGG v. STATE ex rel. SELBY
Discussed
 1958 OK 185, 332 P.2d 677, CITIES SERVICE OIL COMPANY v. MERRITT
Discussed
 1959 OK 97, 340 P.2d 268, BOUDINOT v. STATE
Discussed
 1962 OK 65, 369 P.2d 811, CRUSHED STONE CO. v. MOORE
Discussed
 1908 OK 263, 99 P. 911, 22 Okla. 890, TERRITORY v. LONG BELL LUMBER CO.
Discussed at Length
 1920 OK 50, 187 P. 806, 77 Okla. 130, ONE HUDSON SUPER-SIX AUTO. v. STATE
Discussed
 1909 OK 200, 103 P. 1021, 24 Okla. 252, STATE ex rel. WEST v. STATE CAPITAL CO.
Discussed at Length
 1909 OK 202, 103 P. 691, 24 Okla. 201, THE HOMESTEADERS v. MCCOMBS
Discussed
 1966 OK 46, 412 P.2d 199, PHILLIPS v. ALTMAN
Discussed
 2002 OK 62, 51 P.3d 1219, K & H WELL SERVICE, INC. v. TCINA, INC.
Discussed
 1931 OK 693, 7 P.2d 888, 155 Okla. 63, OKLAHOMA CITY v. WEST
Discussed at Length
 1923 OK 509, 217 P. 467, 90 Okla. 267, McNULTY v. STATE ex rel. SEAVER Co. Atty. Tulsa Co.
Discussed
 1972 OK 37, 495 P.2d 105, MACKEY v. STATE EX REL. HARRIS
Discussed
 1974 OK 52, 521 P.2d 1353, KIRKLAND v. GENERAL MOTORS CORPORATION
Discussed at Length
 2004 OK 82, 102 P.3d 133, THOMAS v. E-Z MART STORES, INC.
Discussed
 2006 OK 49, 142 P.3d 410, STATE ex rel. OKLAHOMA BAR ASSOCIATION v. BEASLEY
Discussed
 2008 OK 56, 187 P.3d 735, WATSON v. GIBSON CAPITAL, L.L.C.
Discussed
 1996 OK 118, 933 P.2d 272, 67 OBJ 3136, Nichols v. Mid Continent Pipe Line Company
Discussed at Length
 2009 OK 61, 222 P.3d 1058, STATE ex rel. PROTECTIVE HEALTH SERVICES STATE DEPT. OF HEALTH v. VAUGHN
Discussed
 2009 OK 65, 222 P.3d 21, KIRBY v. JEAN'S PLUMBING HEAT & AIR
Discussed
 2011 OK 84, 264 P.3d 1197, STATE ex rel. OKLAHOMA BAR ASSOCIATION v. MOTHERSHED
Discussed
 1974 OK 146, 532 P.2d 1377, CUNNINGHAM v. CHARLES PFIZER & CO., INC.
Discussed
 1975 OK 123, 540 P.2d 1165, STATE EX REL. FIELD v. HESS
Discussed at Length
 2015 OK 73, 362 P.3d 186, McGINNITY v. KIRK
Discussed
 2016 OK 113, 387 P.3d 333, MUSTANG RUN WIND PROJECT, LLC v. OSAGE COUNTY BD. OF ADJUSTMENT
Discussed
 1978 OK 142, 591 P.2d 1260, SMITH v. JOHNSTON
Discussed
 2019 OK 59, 451 P.3d 125, I. T. K. v. MOUNDS PUBLIC SCHOOLS
Discussed
 2020 OK 30, 465 P.3d 1213, FARLEY v. CITY OF CLAREMORE
Discussed
 2021 OK 7, 481 P.3d 883, IN THE MATTER OF THE ASSESSMENTS FOR TAX YEAR 2012 OF CERTAIN PROPERTIES
Discussed
 1981 OK 158, 638 P.2d 455, State ex rel. Fallis v. Mike Kelly Const. Co.
Discussed
 1926 OK 214, 248 P. 561, 120 Okla. 40, McPHERSON v. FIRST PRESBYTERIAN CHURCH of WOODWARD
Discussed
 1950 OK 329, 239 P.2d 1028, 205 Okla. 530, PEERSON v. MITCHELL
Discussed
 1949 OK 42, 205 P.2d 301, 201 Okla. 303, SMILIE v. TAFT STADIUM BD. OF CONTROL
Discussed
 1998 OK 69, 980 P.2d 99, 69 OBJ 2493, Harrell v. Samson Resources Co.
Discussed
 1999 OK 44, 981 P.2d 1253, 70 OBJ 1664, Taylor v. State Farm Fire and Casualty Co.
Discussed
 1911 OK 122, 115 P. 344, 28 Okla. 556, BOWLES v. NEELY
Discussed
 1912 OK 806, 132 P. 319, 38 Okla. 218, JONES v. STATE
Discussed
 1984 OK 96, 711 P.2d 38, Oklahoma Water Resources Bd. v. Texas County Irr. and Water Resources Ass'n, Inc.
Discussed
 1985 OK 43, 702 P.2d 33, Briscoe v. Harper Oil Co.
Discussed
 1985 OK 103, 714 P.2d 1017, 56 OBJ 2889, Jackson v. Williams
Discussed
Title 12. Civil Procedure
 Cite
Name
Level

 12 O.S. 95, Limitation of Other Actions
Discussed
 12 O.S. 2, Common Law to Remain in Force in Aid of General Statutes
Cited
Title 21. Crimes and Punishments
 Cite
Name
Level

 21 O.S. 1191, Penalty for Public Nuisance
Cited
Title 23. Damages
 Cite
Name
Level

 23 O.S. 15, Several Liability - Civil Action Based on Fault, Not Arising Out of Contract
Cited
Title 50. Nuisances
 Cite
Name
Level

 50 O.S. 1, Nuisance Defined
Discussed at Length
 50 O.S. 2, Public Nuisance Defined
Cited
 50 O.S. 6, Abatement Not to Prejudice Right to Recover Damages for Past Existence
Cited
 50 O.S. 11, Public Nuisance - Abatement by Public Body or Officer
Cited
Title 51. Officers
 Cite
Name
Level

 51 O.S. 1, Beginning of Term - Time of Qualifying
Cited
Title 63. Public Health and Safety
 Cite
Name
Level

 63 O.S. 2-309A, Short Title
Cited
 63 O.S. 2-309C, Dispenser of Schedule II, III, IV or V Controlled Dangerous Substance - Central Repository - Transmission - Penalty for Willful Failure to Transmit Information
Cited
 63 O.S. 2-201, Authority to Control - Recommendations
Cited


 
 








 
 
 
 

 
 




 
 
 
 oscn
 
 EMAIL: webmaster@oscn.net
 Oklahoma Judicial Center
 2100 N Lincoln Blvd.
 Oklahoma City, OK 73105
 
 
 courts
 
 Supreme Court of Oklahoma
 Court of Criminal Appeals 
 Court of Civil Appeals
 District Courts
 
 
 
 decisions
 
 New Decisions
 Supreme Court of Oklahoma
 Court of Criminal Appeals
 Court of Civil Appeals
 
 
 
 programs
 
 The Sovereignty Symposium
 
 Alternative Dispute Resolution
 Early Settlement Mediation
 Children's Court Improvement Program (CIP)
 Judicial Nominating Commission
 Certified Courtroom Interpreters
 Certified Shorthand Reporters
 Accessibility ADA
 
 
 
 
 
 
 
 
 Contact Us
 Careers
 Accessibility ADA